510 A.2d 735

**COMMONWEALTH of Pennsylvania**

v.

**Anthony J. GALLAGHER, Appellant.**

Superior Court of Pennsylvania.

Argued April 4, 1985.

Filed May 12, 1986.

428

430

Seymore Johnson, Jr., Philadelphia, for appellant.

Dawn L. Morton, Assistant District Attorney, Philadelphia, for Com., appellee.

Before CAVANAUGH, OLSZEWSKI and HOFFMAN, JJ.

HOFFMAN, Judge:

This is an appeal from the judgment of sentence for involuntary deviate sexual intercourse, 18 Pa.C.S.A. § 3123. Appellant contends that (1) the trial court erred in (a) allowing the Commonwealth to present expert testimony on the "rape trauma syndrome," (b) excluding testimony by appellant's expert witness, (c) allowing Dominic Ragno to testify, and (d) permitting the jury to take two mugshots of

appellant into the jury deliberation room; (2) the trial court lacked jurisdiction to try him; (3) he was denied the right to a non-jury trial; (4) the lower court erred in denying his petition for habeas corpus; (5) his trial counsel was ineffective for failing to (a) raise a statute of limitations defense, (b) raise a Rule 1100 defense, (c) object to portions of the complainant's testimony, (d) move for dismissal of the charges against appellant for a violation of the Interstate Agreement on Detainers, (e) interview or call two alibi witnesses, and (f) present certain evidence; and (6) his sentence was (a) excessive and (b) unconstitutional. We disagree and, accordingly, affirm.

In the early morning hours of November 26, 1977, the complainant was sexually assaulted by a man who had gained entrance to her home by posing as a police officer. At the time, she recognized her assailant as a man named Gallagher who had visited her house six months earlier to give her an estimate for installing windows in her basement. On that occasion, he had also claimed to be a police officer. Two weeks after the assault, the complainant was shown a photographic display containing appellant's picture; she also confronted appellant at the police station, but was unable to identify him positively in either instance.[1] In February, 1982, however, the complainant positively identified appellant in both a photographic display and a lineup.

Appellant was arrested on February 17, 1982 and charged with rape, indecent assault, indecent exposure, involuntary deviate sexual intercourse, burglary, aggravated assault, simple assault, and impersonating a public servant. On April 14, 1982, appellant filed a petition for a writ of habeas corpus on the ground that the police lacked probable cause to arrest him. This petition was denied on September 15, 1982. On March 9, 1983, following a seven-day trial, the jury found appellant guilty of involuntary deviate sexual

---

1. The complainant testified that, although appellant resembled her attacker, his hair and moustache were different, and she was unable to make a positive identification. *See* N.T. March 2, 1983 at 373–75.

intercourse.[2] Post-verdict motions were filed by new counsel; the lower court denied them on May 29, 1984. On that same date, appellant was sentenced to a term of ten-to-twenty years imprisonment. He filed a motion to reconsider the sentence which the lower court denied on June 26, 1984. This appeal followed.

Appellant's primary contention is that the trial court erred in allowing Dr. Ann Burgess to testify concerning the rape trauma syndrome. At trial, appellant did not contest the occurrence of the rape and assault, but claimed that the complainant had incorrectly identified him as her attacker. Thus, the reliability of the complainant's identification became the central issue at trial.

In order to explain why the complainant was able to identify appellant four years after the assault, although she had been unable to do so only two weeks after it, the Commonwealth introduced Dr. Burgess's testimony on the rape trauma syndrome, a psychological condition observable in rape victims.[3] After testifying to her extensive creden-

---

**2.** Appellant was not tried for the remaining seven charges because the statute of limitations for each had expired. *See* 42 Pa.C.S.A. § 5552.

**3.** Dr. Burgess and Dr. Lynda Holmstrom coined the term "rape trauma syndrome" to describe the psychological phenomenon they identified during a clinical study of rape victims conducted in 1972 and 1973. Since the publication of their findings in 1974, *see* A. Burgess & L. Holmstrom, *Rape: Victim of Crisis* (1974); Burgess & Holmstrom, *Rape Trauma Syndrome*, 131 Am.J.Psychiatry 981 (1974), the theory of rape trauma syndrome has been widely accepted. *See In re: Matter of Pittsburgh Action Against Rape*, 494 Pa. 15, 38–43, 428 A.2d 126, 138–40 (1981) (Larsen, J. dissenting); *see also* Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minn.L.Rev. 395, 427–32 (1975) (reviewing development of theory) [hereinafter cited as Massaro]; Raum, *Rape Trauma Syndrome as Circumstantial Evidence of Rape*, 11 J.Psychiatry & L. 203, 207 nn. 14, 15 (1983) (collecting medical literature on theory); Comment, *Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution*, 33 Am.U.L.Rev. 417, 417 nn. 2–4 (1984) (same). Rape trauma syndrome is also recognized by the American Psychiatric Association (APA) as a psychiatric disorder under the broader classification of post-traumatic stress disorders. *See* APA, *Diagnostic and Statistical Manual of Mental Disorders*, 236, 308.30, 309.81 (3d ed. 1980).

tials, Dr. Burgess described the symptoms of rape trauma syndrome as occurring in two phases:

> The symptoms are basically broken into two sections: the symptoms that occur right after the rape, which we call the acute phase, and these symptoms are very related to general stress symptoms; for example, the victim can't sleep or can't eat or is very upset and can't think about anything like what their normal activities are, have difficulty going back to work, to school, taking care of their children, whatever their normal pattern has been, because of the emotional impact of the event.

> These symptoms tend to subside within a few days to weeks, so that person can at least get back into their usual routine.

> Then the second phase is what we call the reorganization phase, and this is where the person now must deal with the symptoms that are very specific to the rape. We call them the rape-related symptoms, and these symptoms can take months, years, for the person to really fully integrate into their psychological experience so that they can go about their business as they had prior to the event.

N.T. March 4, 1983 at 5.76. After elaborating on these symptoms, Dr. Burgess testified that she believed that the complainant was suffering from rape trauma syndrome, and enumerated the symptoms exhibited by the complainant that had led her to that conclusion. She also explained how phobias associated with the rape trauma syndrome could affect a victim's ability to identify her attacker immediately after the assault, but, after a period of integration that might last years, the victim finally would be able to make an identification. At no time did Dr. Burgess state a personal opinion that the complainant was telling the truth.

Expert testimony is admissible when it involves explanations and inferences not within the ordinary training, knowledge, intelligence and experience of the jury. *Auerbach v. Philadelphia Transport Co.*, 421 Pa. 594, 604, 221 A.2d 163, 171 (1966); *Kubit v. Russ*, 287 Pa.Superior Ct.

28, 35, 429 A.2d 703, 706 (1981). Of course, such testimony must also be relevant, that is, it must tend to make a fact at issue more or less probable, *see Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983), and it should not confuse, mislead, or prejudice the jury. *See Lewis v. Mellor,* 259 Pa.Superior Ct. 509, 515, 393 A.2d 941, 944 (1978). As the dissent notes, the admission of expert testimony is a matter within the sound discretion of the trial court, and its decision will not be reversed absent a clear abuse of that discretion. *Laubach v. Haigh,* 433 Pa. 487, 491, 252 A.2d 682, 683 (1969); *Kubit v. Russ, supra* 287 Pa.Superior Ct. at 35, 429 A.2d at 706.

■ Here, we believe that Dr. Burgess's testimony was relevant to the central issue of identification and, if believed by the jury, was useful to explain a psychological phenomenon beyond the knowledge and experience of the average juror. We also find no evidence that this testimony confused, misled, or prejudiced the jury. We therefore conclude that the lower court did not abuse its discretion in admitting Dr. Burgess's testimony.[4]

The dissent, while conceding that Dr. Burgess's testimony was relevant to the issue of identification, *see* dissenting op. at 751, nevertheless finds it inadmissible. It would base this finding upon two grounds: that Dr. Burgess was not qualified to present expert testimony that the complainant suffered from rape trauma syndrome and that Dr. Bur-

---

4. Appellant also argues that Dr. Burgess's testimony should have been excluded because (1) her name was not disclosed in discovery and (2) her testimony was based, in part, upon a police report and the notes of testimony from the preliminary hearing. The lower court found that, even if the Commonwealth had erred in failing to disclose Dr. Burgess's name in advance of trial, appellant was not prejudiced in the preparation of his defense and did avail himself of countervailing expert testimony. *See* Lower Court Opinion at 12–13. We agree and, therefore, find no abuse of discretion in allowing the testimony. Appellant's second argument is waived as it was not raised in any of his post-verdict motions. *See Commonwealth v. Cargo,* 498 Pa. 5, 8–9 & n. 7, 16, 444 A.2d 639, 640–41 & n. 7, 645 (1982) (issue waived where not raised in post-verdict motions; inclusion of issue in brief submitted in support of post-verdict motions is not a permissible substitute for raising the issue by post-verdict motion).

gess's testimony bolstered the credibility of the complainant, thereby invading the province of the jury to determine credibility. We cannot agree with either of these grounds.

■ The dissent would find first that, while Dr. Burgess's expertise qualified her to testify about the phenomenon of rape trauma syndrome, she was not qualified to testify as to her conclusion that the complainant was suffering from the syndrome. We do not believe that this issue is properly before our Court. Although appellant arguably objected to Dr. Burgess's qualifications at trial, *see* N.T. March 4, 1985 at 5.75,[5] he failed to preserve this issue for appellate review by raising it in his post-verdict motions, filed March 15, 1983; his amended post-verdict motions, filed October 11, 1983; his further amended post-verdict motions, filed March 1, 1984; or in any of the numerous post-verdict motions filed *pro se* by appellant. *See Commonwealth v. Seachrist*, 478 Pa. 621, 624, 387 A.2d 661, 663 (1978) (issues not raised in post-verdict motions are waived on appeal). He also failed to raise the issue in his statement of questions involved contained in his brief to this Court, *see* Pa.R.A.P. 2116 (ordinarily no point will be considered which is not set forth in the statement of questions involved), or in the argument section of that brief, *see Commonwealth v. Balch*, 328 Pa.Superior Ct. 71, 76, 476 A.2d 458, 461 (1984) (issues not argued in brief are waived). I would, therefore, find this issue waived. *See also Wiegand v. Wiegand*, 461 Pa. 482, 485, 337 A.2d 256, 257 (1975) (ordinarily, Superior Court may not raise issue *sua sponte* ).

■ Even if the issue were not waived, however, we conclude that Dr. Burgess was qualified to testify. The

---

**5.** At the conclusion of his cross-examination of Dr. Burgess concerning her qualifications, appellant's counsel said, "I would object," without stating any reason for his objection. N.T. March 4, 1983 at 5.75. In a prior side bar conference with the court, appellant's counsel had objected to the whole of Dr. Burgess's testimony as being irrelevant and invading the province of the jury. He did not object to her qualifications. *See id.* at 5.62. The trial court told appellant's counsel that those objections would be preserved, but informed him that objections to the testimony on any other grounds must be brought to the court's attention. *Id.* at 5.64.

dissent would find that Dr. Burgess was not qualified to testify because she holds a doctorate in nursing rather than a medical degree. *See* dissenting slip op. at 9–10. This Court has previously held, however, that an expert need not have a medical degree in order to testify to the diagnosis of a psychological condition. In *Kravinsky v. Glover*, 263 Pa.Superior Ct. 8, 396 A.2d 1349 (1979), and *Simmons v. Mullen*, 231 Pa.Superior Ct. 199, 331 A.2d 892 (1974), we held that psychologists, who hold doctoral rather than medical degrees, were qualified to testify as to their diagnoses of emotional disturbances.

For the purpose of comparison, we note that in *Kravinsky* this Court concluded that a psychologist with the following credentials was qualified to testify about his diagnosis of a psychological condition: a Ph.D. in psychology; a one-year internship in clinical psychology; one year of postdoctoral training in behavior therapy; three years of teaching undergraduate psychology at the State University of New York, Buffalo; five years of private practice; treatment of twenty to twenty-five patients for the psychological condition at issue; and publication of several articles on that condition. Here, Dr. Burgess's credentials were as relevant and supportive of her ability to diagnose rape trauma syndrome as those of the psychologist in *Kravinsky* to diagnose the psychological condition at issue in that case. Dr. Burgess received a master's degree in psychiatric nursing and a Ph.D. in nursing science and is a certified specialist in mental health nursing. She received three years of clinical training at the Massachusetts Mental Health Center and did a clinical internship at the Massachusetts Treatment Center. She has taught courses in psychiatric nursing and research at Boston College since 1966 and at Boston University since 1968 and has been a full professor at both institutions. She was Chairperson of the Graduate Program in Nursing at Boston College and both Director of Nursing Research and Interim Dean at Boston University School of Nursing. She has had a private clinical practice since 1966, specializing in the treatment of persons experi-

encing life crises. In 1972 and 1973, Dr. Burgess did clinical research involving 146 rape victims that resulted in the development of the theory of rape trauma syndrome. Since that time, she has written three books and over twenty articles on rape trauma syndrome, has lectured on the subject, and has chaired the National Advisory Board to the National Rape Center which reports directly to the Secretary of the United States Department of Health and Human Services. *See* N.T. March 4, 1983 at 5.30–.36, 5.66–.75.

These credentials, particularly her clinical practice and her work and research with rape victims, gave Dr. Burgess an adequate basis for her opinion that the complainant exhibited symptoms of rape trauma syndrome. *See id.* at 5.82, 5.89. In light of the discretion that must be accorded to the trial court's finding that Dr. Burgess was qualified to testify as she did, and rejecting, under these facts, formalistic distinctions between a psychiatrist, a psychologist, and a nurse, we conclude that Dr. Burgess's training, expertise, and clinical experience qualified her to testify on both the general topic of rape trauma syndrome and her conclusions with regard to the complainant. *Cf. Commonwealth v. Baldwin,* 348 Pa.Superior Ct. 368, 502 A.2d 253 (1985) (admitting expert testimony of social worker on dynamics of intra-family sexual abuse and victim behavioral patterns).

This conclusion is supported by caselaw in jurisdictions where expert testimony concerning rape trauma syndrome has been admitted. Contrary to the dissent's conclusions, *see* dissenting op. at 753–754 n. 5, most jurisdictions admitting rape trauma syndrome evidence do not require that an expert witness hold a medical degree in order to testify that a complainant exhibits symptoms of rape trauma syndrome. *See State v. Huey,* 145 Ariz. 59, 699 P.2d 1290 (1985) (testimony of a person qualified by training and experience, such as a psychiatrist or a psychologist, that complainant has characteristics associated with rape trauma syndrome held admissible); *State v. Young,* No. 57,369, slip op. (Kan. July 26, 1985) (psychologist is competent to testify to diag-

nosis of rape trauma syndrome); *People v. Stull*, 127 Mich.App. 14, 338 N.W.2d 403 (1983) (testimony of rape counselor that complainant's behavior was consistent with profile of a rape victim held admissible); *State v. Liddell*, 685 P.2d 918 (Mont.1984) (testimony of doctor, psychiatric nurse, and psychological counselor that victim had symptoms of rape trauma syndrome held admissible); *People v. Reid*, 123 Misc.2d 1084, 475 N.Y.S.2d 741 (Sup.Ct.1984) (prosecution may introduce testimony of psychologist that complainant has rape trauma syndrome); *State v. LeBrun*, 37 Or.App. 411, 587 P.2d 1044 (1978) (testimony of "Rape Victim Advocate" associated with district attorney's office that complainant's emotional state comported with that of other sexual abuse victims held admissible); *see also* Comment, *Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecutions*, 33 Am.U.L.Rev. 417, 451 n. 282 (1984) (nurses are licensed by the states to diagnose mental disorders); *cf. People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984) (excluding on other grounds testimony of rape counselor with masters degree in psychology and social work that complainant had rape trauma syndrome); *People v. Pullins*, 145 Mich.App. 414, 378 N.W.2d 502 (1985) (excluding on other grounds testimony by therapist that complainant had rape trauma syndrome); *State v. Taylor*, 663 S.W.2d 235 (Mo.1984) (en banc) (testimony of expert in psychological testing field that complainant had characteristics consistent with those resulting from a traumatic stress reaction, such as rape, so long as term "rape trauma syndrome" is not used, held admissible); *State v. Whitman*, 16 Ohio App.3d 246, 475 N.E.2d 486 (1984) (court would allow expert testimony on rape trauma syndrome but rejects qualifications of social worker with no prior experience in diagnosing condition).[6]

**6.** The dissent also states that "Dr. Burgess did not purport to be an expert on a victim's ability to identify," dissenting op. at 460, and refers to the growing trend towards admitting expert testimony on the reliability of eyewitness identifications. *See id.* at 460 n. 5. While it is true that Dr. Burgess did not purport to be an expert on the general

■■■■■■■■

The dissent's second ground for rejecting Dr. Burgess's testimony is that it allegedly bolsters the complainant's credibility, thereby invading the exclusive province of the jury to determine the credibility of witnesses. *See* dissenting op. at 753. The theory behind excluding expert testimony that bolsters a witness's credibility is that it may encourage the jury to rely upon the expert's evaluation of the witness's veracity rather than making its own.[7] *See Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976).[8]

subject of the reliability of eyewitness identifications, her training, research, and expertise did qualify her to testify on how the symptoms of rape trauma syndrome could affect the ability of a rape victim to identify her attacker.

7. In *Commonwealth v. Baldwin, supra,* however, this Court noted that expert testimony cannot "invade the province of the jury" unless the jury is instructed that the expert's opinion is binding upon it. 348 Pa.Superior Ct. at 376, 502 A.2d at 257 (citing Massaro, *supra* note 3, at 443). The Massaro article also points out that the traditional assumption that jurors will be unduly deferential to expert testimony has been belied by empirical evidence. *See* Massaro, *supra* note 3, at 444.

8. In support of its conclusion that Dr. Burgess's testimony was inadmissible because it bolstered the complainant's credibility, the dissent cites *O'Searo,* and an analogous case, *Commonwealth v. Battle,* 289 Pa.Superior Ct. 369, 433 A.2d 496 (1981). In *O'Searo,* our Supreme Court upheld the exclusion of expert testimony by a psychologist who intended to testify that a defendant charged with murder had not intended to harm the victim but had discharged his gun accidentally. The Court held that the sole purpose of such testimony was to buttress the defendant's credibility and it thereby invaded the province of the jury to determine a witness's credibility. *Id.* 466 Pa. at 229, 352 A.2d at 32.

In holding that psychological testimony is inadmissible to bolster a witness's credibility, however, the Court distinguished expert testimony designed to explain a person's behavior under a given stimulus. *Id.* We believe that this distinction also applies to the expert testimony presented in the instant case. While the dissent argues correctly that expert psychological testimony is not admissible merely to bolster a witness's credibility, we do not believe that Dr. Burgess's testimony was offered with that object. Instead, it was offered to explain that the complainant's failure to identify appellant two weeks after the attack was the reaction to a given stimulus: sexual assault. We therefore find that *O'Searo,* and the analogous case, *Battle,* do not preclude Dr. Burgess's testimony.

■ The contention that rape trauma syndrome evidence bolsters the credibility of a complainant has been raised in almost every instance where such evidence has been introduced. However, most jurisdictions have rejected that contention and found that expert testimony on rape trauma syndrome is admissible in certain circumstances because it aids the jury in understanding a subject beyond the knowledge and experience of an average lay person. Because the information imparted by such expert testimony is beyond the average juror's knowledge, its admission will not invade the jury's province.

The dispute among the states that have considered the admissibility of expert testimony on rape trauma syndrome has centered upon its reliability in proving or corroborating that a rape occurred or that the victim did not consent rather than the likelihood that it will bolster credibility. Five states have ruled that expert testimony on rape trauma syndrome is admissible to prove lack of consent or to corroborate testimony that a rape occurred. *See State v. Huey,* 145 Ariz. 59, 699 P.2d 1290 (1985) (rape trauma syndrome evidence on the issue of consent held admissible but court questions its use to prove that a rape occurred); *State v. Marks,* 231 Kan. 645, 647 P.2d 1292 (1982) (court holds rape trauma syndrome testimony on the issue of consent admissible and finds that it provides detectable, reliable evidence of forceable assault); *State v. Liddell,* 685 P.2d 918 (Mont.1984) (rape trauma syndrome evidence on the issue of consent held admissible); *State v. Stafford,* 77 N.C.App. 19, 334 S.E.2d 799 (1985) (majority would allow testimony on characteristics of rape trauma syndrome to corroborate complainant's testimony); *State v. Whitman,* 16 Ohio App.3d 246, 475 N.E.2d 486 (1984) (court would admit qualified expert's testimony on rape trauma syndrome to corroborate testimony of complainant). Missouri courts will also admit expert testimony that a complainant exhibits characteristics consistent with those resulting from a traumatic stress reaction, such as rape, so long as the term "rape trauma syndrome" is not used and no opinion is

expressed concerning the complainant's veracity. *See State v. Taylor,* 663 S.W.2d 235 (Mo.1984); *State v. Shaw,* 694 S.W.2d 857 (Mo.App.1985). Four other states have excluded evidence of rape trauma syndrome on the ground that it does not reliably prove rape or lack of consent. These cases focus on the development of the theory of rape trauma syndrome as a therapeutic tool rather than a fact-finding device and its apparent similarity to other post-traumatic stress disorders. *See People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984) (expert testimony on rape trauma syndrome inadmissible to prove that a rape occurred); *Allewalt v. State,* 61 Md.App. 503, 487 A.2d 664 (1985) (rape trauma syndrome evidence inadmissible to prove rape or lack of consent); *People v. Pullins,* 145 Mich.App. 414, 378 N.W.2d 502 (1985) (rape trauma syndrome evidence inadmissible to prove rape); *State v. Saldana,* 324 N.W.2d 227 (Minn.1982) (rape trauma syndrome evidence inadmissible to prove lack of consent).

No other state has considered yet the admissibility of expert testimony on rape trauma syndrome to explain a complainant's initial inability to identify her assailant. It has been admitted in other states, however, to explain similar elements of a complainant's behavior that may be confusing to a jury. In *State v. Staples,* 120 N.H. 278, 415 A.2d 320 (1980), the complainant was unable to remember clearly the events preceding the rape, but vividly recalled the actual assault. The defendant contended that the victim could not remember the preceding events because she was drunk and had fabricated the charge of rape. In order to rebut the allegation that drinking had caused the complainant's memory loss, the prosecution presented expert testimony that such memory loss was not unusual among rape victims. The defendant objected that this testimony was improper because it bolstered the complainant's credibility, but the court found that the testimony aided the jury in understanding the complainant's partial memory loss and was admissible so long as no expert opinion was given as to the complainant's veracity. In *People v. Reid,* 123 Misc.2d

1084, 475 N.Y.S.2d 741 (Sup.Ct.1984), the complainant recanted her allegation of rape, and, in response to the defendant's introduction of the recantation at trial, the prosecution sought to introduce expert testimony that false recantations are a symptom of rape trauma syndrome and that the complainant was suffering from the syndrome. Again, the court found that such testimony was admissible and did not invade the province of the jury so long as the expert did not testify that she believed the complainant. Even the California Supreme Court, which rejected the use of rape trauma syndrome evidence to prove rape or lack of consent, has recognized that such testimony may be admissible to explain elements of the complainant's conduct to the jury. In *People v. Bledsoe, supra,* the court found that expert testimony on rape trauma syndrome might be useful to disabuse the jury of misconceptions about rape and rape victims, for example, by explaining that a delay in reporting a rape is common among rape victims and need not support an inference that the complaint was fabricated. 36 Cal.3d at 247–48, 681 P.2d at 298, 203 Cal.Rptr. at 457, 681 P.2d at 298.[9]

Similarly, in the instant case, appellant based his claim that he was not the man who had attacked the complainant upon her inability to positively identify him two weeks after the attack. The Commonwealth presented Dr. Burgess's testimony that the symptoms of rape trauma syndrome might prevent a rape victim from identifying the rapist for an extended period of time in order to rebut appellant's

9. We note that Pennsylvania and several other states have generally accepted expert testimony to explain the conduct of children who are victims of sexual abuse. *See Commonwealth v. Baldwin, supra* 348 Pa.Superior Ct. at 374–375, 502 A.2d at 256 (collecting cases); *see also People v. Ashley,* 687 P.2d 473 (Colo.App.1984); *Kruse v. State,* 483 So.2d 1383 (Fla.App.1986); *State v. Myers,* 359 N.W.2d 604 (Minn. 1984); *Smith v. State,* 100 Nev. 570, 688 P.2d 326 (1984); *People v. Benjamin R.,* 103 A.D.2d 663, 481 N.Y.S.2d 827 (1984); *State v. DeJoinville,* 145 Vt. 603, 496 A.2d 173 (1985); *State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173 (1984). Generally, testimony concerning the effects of sexual assault on children was introduced in these cases to explain delays in reporting rape or other sexual assault, recantations, or reluctance to testify.

contention that the complainant was mistaken in her subsequent identification. We believe that the lower court properly found that such testimony imparted information beyond the knowledge of the average lay person and would assist the jury in making its determination of the complainant's credibility. Without expressing any opinion about the complainant's veracity,[10] Dr. Burgess explained the basis for her opinion that the complainant suffered from rape trauma syndrome, and the jury was free to accept or reject this testimony.[11] We would, therefore, hold that this testi-

10. *Cf. Commonwealth v. Baldwin, supra* 348 Pa.Superior Ct. at 377, 502 A.2d at 257 (expert may testify on dynamics of child sexual abuse and victim behavior so long as he expresses no opinion on accuracy of victim's recitation of facts).

11. The trial court charged the jury to evaluate the testimony of witnesses, in general, and experts, such as Dr. Burgess, in particular, as follows:

You are cautioned that you are to apply these standards evenhandedly to all and each of the witnesses. You must be careful not to give any greater weight or lesser weight to the testimony of any particular witness merely because *that witness happens to have a title,* or because that witness happens to be a policeman. You are to weigh the evidence evenhandedly, applying the criteria upon which credibility depends evenhandedly as to each and every witness, remembering not to give any greater weight or lesser weight to the testimony of a policeman or a doctor or any other title that you may have heard the witness bear, solely because he bears that title.

&ast; &ast; &ast; &ast; &ast; &ast;

Generally, a witness may not opinionate or give an opinion or draw inferences. Inferences are for you to draw.

There is an exception to this rule. That exception is the expert witness rule. An expert witness is one who, by training, by education, experience, has acquired a special level of skill in a particular science, trade, calling, or profession. By virtue of that special skill or knowledge, an expert witness is permitted, unlike another witness, an expert is permitted to give explanations or draw inferences which are *not within the range of ordinary knowledge,* intelligence, or experience, and maybe even to give an opinion and state his reasons therefore.

Now, in this case you have had a number of witnesses which I had qualified as giving you expert witness testimony. You heard from the officer who testified about some particular skill, fingerprinting. You heard from Dr. Tumosa who talked about the seminal fluid and the examination thereof; and you heard from Dr. Burgess *about the rape syndrome, post-rape syndrome.*

In deciding whether or not to accept their inferences, their explanations, or their opinions, you should consider the evidence as to

mony did not invade the province of the jury by impermissibly bolstering the complainant's credibility.[12]

The remainder of appellant's contentions are completely without merit, and we will dispose of them summarily.

■ Appellant contends that the trial court erred in "forbidding" his expert, Dr. Perry Berman, to testify. *See* Brief for Appellant at 11. This contention misstates the trial court's ruling. The court held that Dr. Berman could testify to the same extent that Dr. Burgess had. *See* N.T. March 7, 1983 at 5.21–.23. Appellant's counsel, however, tried to question Dr. Berman about the desire for revenge displayed by victims of rape trauma syndrome, including the complainant. The trial court ruled that this testimony was inadmissible because (1) the testimony went beyond the scope of Dr. Burgess's testimony and (2) the complainant had already testified about her desire for revenge. *Id.* In response to this ruling, appellant's counsel decided not to present any testimony by Dr. Berman. Accordingly, we do not find that the trial court abused its discretion in limiting Dr. Berman's testimony. *See Laubach v. Haigh, supra* (admission of expert testimony within sound discretion of trial court).

> their training, the education and experience as well as the reasons and the facts on which their opinions are based.
> You don't have to accept their testimony. You test it like you do any other witness' testimony. Your object is to determine the truth. Those witnesses are presented to you as an aid in the truth-finding process.

N.T. March 7, 1983 at 5.44–.45, 5.49–.51.

**12.** *Cf. People v. Fisher,* 73 A.D.2d 886, 424 N.Y.S.2d 197 (1980), *aff'd,* 53 N.Y.2d 907, 440 N.Y.S.2d 630, 423 N.E.2d 53 (1981). In *Fisher,* a woman did not immediately identify the person who killed her fiance. Only after some time had passed was she able to tell the police that the killer was her former boyfriend. The prosecution introduced expert testimony that the woman's failure to immediately identify the former boyfriend was consistent with the psychological phenomenon of "repression" or "blockage" of an emotionally painful event. The court found this testimony helpful to the jury and held that it did not usurp the jury's function of determining the credibility of the woman's testimony. In reaching this conclusion, the court also noted that the expert had not testified that he believed the woman.

Appellant next contends that the trial court erred in allowing Dominic Ragno to testify. He argues first that Ragno's testimony should have been excluded because the Commonwealth did not disclose his name in pretrial discovery. This issue is waived as appellant's counsel did not object to Ragno's testimony on this basis, *see* N.T. March 3, 1983 at 4.102–.03. *See also Ebner v. Ewiak*, 335 Pa. Superior Ct. 372, 376, 484 A.2d 180, 182 (1984) (issue not preserved for appellate review when different ground for objection was presented at trial).

Appellant also argues that Ragno's testimony should have been excluded because it was the fruit of an illegally obtained statement. He alleges that the Commonwealth learned of Ragno from a statement appellant made to police after his February 17, 1982 arrest that was inadmissible under the *Davenport* rule. *See Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977) (where accused is not arraigned within six hours of arrest, any statement obtained after arrest and before arraignment is inadmissible). Appellant's argument is factually flawed, however, because the statement in which he referred to Ragno was not made on February 17, 1982, but in December, 1977 during a non-custodial interview. We therefore find this contention meritless.

Appellant contends next that the trial court erred in allowing the jury to take two mugshots of him into the jury room while it was deliberating. The pictures had been admitted into evidence without objection. *See* N.T. March 7, 1983 at 5.30. The exhibits that a jury may consider in the jury room are within the trial court's discretion, *see* Pa.R. Crim.P. 1114, and we can find no abuse of that discretion in the instant case. *See Commonwealth v. Kingsley*, 480 Pa. 560, 578, 391 A.2d 1027, 1036 (1978) (no error to allow jury to have evidence during deliberations where it was received without objection).

Appellant next contends that the court below lacked jurisdiction to try him. He alleges that before trial he filed

an appeal to this Court thereby divesting the lower court of jurisdiction. *See* Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken ..., the trial court ... may no longer proceed further in the matter."). We have searched the record and conclude that no notice of appeal was filed before appellant's trial commenced.[13] This contention is therefore meritless.

■ Appellant contends next that he was denied his right to waive a jury trial. We find this contention frivolous as there is no absolute right to a non-jury trial. *See* Pa.R.Crim.P. 1101; *see also Commonwealth v. Merrick*, 338 Pa.Superior Ct. 495, 499, 488 A.2d 1, 3 (1985) ("the decision to grant a waiver of a jury trial is one committed to the sound discretion of the trial court"). In the instant case, the trial court found that appellant's request for a bench trial "was a gambit designed to have the case transferred to another court," *see* Lower Court Opinion at 10, because the trial judge would have been compelled to recuse himself after having heard damaging evidence against appellant in the pre-trial motions. We find that the lower court's desire to avoid a "judge-shopping" ploy was an adequate reason for denying appellant's request for a non-jury trial and, accordingly, hold that there was no abuse of discretion.

■ Appellant also contends that the lower court erred in denying his petition for habeas corpus. In that petition, he alleged that the police lacked probable cause to arrest him because the complainant's identification of him was invalid. This contention is meritless because an illegal arrest, after conviction, will not furnish grounds for dis-

---

**13.** The Quartersessions file did contain two copies of a notice of appeal, but we must conclude that no appeal was actually filed with this Court because the copies were not stamped as received and the lower court was never notified that an appeal had been taken. *See* N.T. May 29, 1984 at 21. Furthermore, the copies indicated that the appeal was being taken from the order of the lower court dated February 28, 1983. *Id.* at 21–23. No lower court order was entered that day so the appeal, if taken, would have been quashed. *See* Pa.R.A.P. 301(a) (no order of lower court shall be appealable until it is entered on docket).

charge on a writ of habeas corpus. *See Commonwealth ex rel. Loveday v. Myers*, 422 Pa. 483, 487, 222 A.2d 725, 728 (1966); *Commonwealth ex rel. Garrison v. Burke*, 378 Pa. 344, 349, 106 A.2d 587, 589 (1954); *see also Commonwealth ex rel. Romano v. Banmiller*, 19 D. & C.2d 198, 200 (Ct.C.P.Phila. County) ("The writ of habeas corpus is not a substitute for a motion for a new trial or an appeal or for a writ of error."), *aff'd*, 397 Pa. 606, 156 A.2d 825 (1959).

 Appellant next contends that his counsel was ineffective for several reasons. In examining a claim of ineffectiveness, we must first inquire whether appellant's claim has arguable merit. Only if the claim underlying appellant's allegation of ineffectiveness has arguable merit will we address the other components of our test for ineffectiveness: whether the strategy chosen by counsel had some reasonable basis designed to effectuate appellant's interests and whether counsel's actions so prejudiced appellant as to deny him a fair trial. *See Commonwealth v. Pierce*, 345 Pa.Superior Ct. 324, 327–331, 498 A.2d 423, 425–26 (1985) (en banc), *allocatur granted.* The burden of proving counsel's ineffectiveness rests upon appellant. *Commonwealth v. Murray*, 338 Pa.Superior Ct. 580, 584, 488 A.2d 45, 46 (1985).

 Appellant's first ineffectiveness argument is that his trial counsel should have raised a statute of limitations defense to the charge of involuntary deviate sexual intercourse. Appellant bases this argument upon the statute of limitations contained in 19 P.S. § 211, which, he alleges, contained a two-year statute of limitations for his offense.[14]

14. 19 P.S. § 211 provides, in pertinent part, as follows:
 All indictments which shall hereafter be brought or exhibited for any crime or misdemeanor, murder and voluntary manslaughter excepted, shall be brought or exhibited within the time and limitation hereafter expressed, and not after; that is to say, all indictments and prosecutions for treason, arson, sodomy, buggery, robbery, burglary, perjury, counterfeiting, forgery, uttering or publishing any bank note, check or draft, knowing the same to be counterfeited or forged, shall be brought or exhibited within five years next after the offense shall have been committed; and all indictments and prosecutions for other felonies not named or excepted hereto-

That statute, however, was repealed by implication in 1973 by § 108 of the Crimes Code, 18 Pa.C.S.A. § 108. *See Commonwealth v. Milano,* 300 Pa.Superior Ct. 251, 446 A.2d 325 (1982). Thus, the statute of limitations in effect on the date of the crime, November 26, 1977, provided a five-year period in which to bring a prosecution for involuntary deviate sexual intercourse. 18 Pa.C.S.A. § 108(b)(1).[15] Accordingly, we find that counsel was not ineffective for failing to raise this defense.[16]

■ Appellant argues next that his counsel was ineffective for failing to raise the claim that his trial was barred under Pa.R.Crim.P. 1100. He concedes that the Rule 1100 run-date for his case was February 28, 1983 and that pre-trial motions were heard on that date, *see* Brief for Appellant at 14, but alleges that Rule 1100 was violated because the actual trial did not begin until the following day. The comment to Rule 1100 states:

> For the purpose of this rule, a trial commences when the trial judge determines that the parties are present and directs them to proceed ... to the hearing of any motions which had been reserved for the time of trial....

*See also Commonwealth v. Kluska,* 484 Pa. 508, 399 A.2d 681 (1979) (hearing of motions reserved for time of trial constitutes commencement of trial for purposes of Rule

fore in this section, and for all misdemeanors, perjury excepted, shall be brought or exhibited within two years next after such felony or misdemeanor shall have been committed....

Appellant argues that because the crime of involuntary deviate sexual intercourse is not among the crimes listed as having a five-year statute of limitations, it had only a two-year limitations period. Furthermore, as the lower court noted, the crime of sodomy did have a five-year statute of limitations, and "[t]he crime of involuntary deviate sexual intercourse is but the crime of sodomy by another name." Lower Court Opinion at 5.

15. Section 108 has been repealed and is presently codified at 42 Pa.C.S.A. § 5552.

16. We further note that counsel *did* challenge all of the charges against appellant on the basis of the statutes of limitations. *See* N.T. March 27, 1984 at 23–24; N.T. April 24, 1984 at 5.

1100). Because there was no Rule 1100 violation, we will not find counsel ineffective for failing to raise this claim.[17]

■ Appellant also argues that his counsel was ineffective for failing to object to the complainant's emotional outbursts during her testimony.[18] While appellant's counsel could have objected to some of the complainant's testimony, he testified that he did not because he "felt that [her outbursts] would make her look less credible in the eyes of the jury." N.T. March 27, 1984 at 35. We find that this strategy was reasonably designed to effectuate appellant's interests and, accordingly, will not hold counsel ineffective on this ground.

■ Appellant next argues that his counsel was ineffective for failing to move for dismissal of the charges against him for a violation of the Interstate Agreement on Detainers (the Agreement), 42 Pa.C.S.A. §§ 9101–9108. He cor-

17. Appellant raises a separate claim that his right to a speedy trial was violated because he was tried over four years after the crime had been committed. This issue is waived because appellant failed to include it in his statement of questions involved. *See* Pa.R.A.P. 2116(a). Even if the issue were not waived, it is meritless because the sixth amendment right to a speedy trial is not implicated when a crime is committed, but when a citizen's liberty is restrained by a formal indictment, information, or arrest. *See Commonwealth v. Arnold,* 331 Pa.Superior Ct. 345, 360, 480 A.2d 1066, 1074 (1984).

18. The complainant lost her composure on several occasions during her testimony. Appellant argues that his counsel should have objected to statements such as the following:

I want to get him now. I don't want any time out [from testifying]. I want to get him.

 * * * * * *

There he is, he's the one. He wanted to get caught. He knew he was getting caught. He wanted to get caught. And there he is, caught, Tony Gallagher.

 * * * * * *

He was too sneaky, too devious. The cops weren't on to him. I knew him, they didn't know him—

 * * * * *

[I]t just sets me crazy to see him walking, to know that he did this to me, that he got away with it, because he is devious, sneaky and lying, and I am not lying.

He is the one. He knows he is the one. And I know he's the one. But the cops didn't know it because they don't know him the way I know him.

N.T. March 2, 1983 at 342, 348, 375, 389.

rectly states that the Agreement requires the dismissal of outstanding charges against a prisoner when the prisoner is removed from a state institution for prosecution of those charges in another state and returned to the institution without having been tried on those charges. *See* 42 Pa.C. S.A. § 9101, art. IV(e).[19] The Agreement, however, governs only transfers of prisoners between Pennsylvania and other states, the federal government, its territories and possessions, Puerto Rico, and the District of Columbia. *See id.,* art. II(a). Here, appellant was only transferred from one Pennsylvania facility to another.[20] Accordingly, we find that this argument is meritless and counsel was not ineffective for failing to raise it.

Appellant also argues that his counsel was ineffective for failing to interview or call two alibi witnesses. We have reviewed the record below and find that the lower court correctly concluded that appellant failed to prove that he had given counsel the names or addresses of the two witnesses. *See* Lower Court Opinion at 27–28; N.T. March 27, 1984 at 56–62. At the start of appellant's trial, counsel placed on the record the names and addresses of all the witnesses appellant had identified for him. Appellant then was given the opportunity to supplement that list and failed to add the names of the two witnesses whose absence he now attributes to counsel's ineffectiveness. *See* N.T. March 1, 1983 at 147–49. Under these circumstances, we cannot find counsel ineffective. *See Commonwealth v. Ford,* 491 Pa. 586, 592, 421 A.2d 1040, 1043 (1980) (failure to

**19.** Article IV(c) of the Agreement provides as follows:

If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

**20.** Appellant relies upon *United States v. Thompson,* 562 F.2d 232 (3d Cir.1977), for the proposition that the Agreement also applies to *intra* state transfers of prisoners. That case, however, involved a transfer from state to federal custody within Pennsylvania, a situation clearly covered by the Agreement.

interview witnesses of whose existence counsel is unaware is not ineffectiveness).

■ Appellant's last allegation of ineffectiveness is that counsel failed to introduce certain evidence at trial. He alleges first that counsel should have secured and introduced pictures of his wearing a moustache. He claims that these pictures would have contradicted the complainant's testimony that he was clean-shaven at the time of the assault. While counsel was informed of the existence of the pictures, appellant never gave him the information necessary to locate and obtain the pictures. N.T. March 27, 1984 at 13–14. Furthermore, we do not believe that appellant was prejudiced by counsel's failure to introduce these pictures as they would have been cumulative to other evidence introduced concerning appellant's appearance near the time of the assault. *See, e.g.,* N.T. March 4, 1983 at 5.7, 5.111.

■ Appellant also alleges that counsel should have introduced telephone company records. He claims that these records would have contradicted the complainant's testimony. We hold that appellant has failed to meet his burden of proving counsel's ineffectiveness on this ground because he has not alleged how the documents would have contradicted the complainant's testimony, *see* Brief for Appellant at 22, or introduced them into evidence.[21] *See* N.T. March 27, 1984 at 17.

■ Appellant contends next that his sentence was excessive in light of his personal background.[22] When a sentence is within statutory limits, and the court has com-

21. Appellant did produce several letters concerning telephone records during argument on his post-verdict motions, *see* N.T. May 29, 1984 at 52, but these letters, even if they had been introduced, did not contradict the complainant's testimony.

22. In his brief to this Court, appellant claims that the sentence was excessive because he had only one prior misdemeanor conviction. *See* Brief for Appellant at 31. While this claim may be true, appellant also had at least four prior felony convictions, including a conviction for rape. *See* N.T. March 4, 1983 at 5.135–37; N.T. May 29, 1984 at 70–71.

plied with the Sentencing Code, 42 Pa.C.S.A. §§ 9701–9781, we will not reverse the sentencing court's decision absent a manifest abuse of discretion. *Commonwealth v. Brown,* 314 Pa.Superior Ct. 311, 323, 460 A.2d 1155, 1161 (1983). Here, appellant's sentence was within the statutory limits, and, after reviewing the record, we find that the lower court did consider appellant's personal background. *See* N.T. May 29, 1984 at 61–71. We therefore hold that its sentence did not constitute a manifest abuse of discretion.

Appellant also contends that his sentence was unconstitutional because he was not sentenced pursuant to the sentencing guidelines, 204 Pa.Code §§ 303.1–.9, *reprinted following* 42 Pa.C.S.A. § 9721. This argument is waived because appellant failed to include it in his statement of questions involved. *See* Pa.R.A.P. 2116(a) ("ordinarily no point will be considered which is not set forth in the statement of questions involved").[23]

Having found all of appellant's contentions to be without merit, we affirm the judgment of sentence.

Affirmed.

CAVANAUGH, J., files a dissenting opinion.

CAVANAUGH, Judge, dissenting:

I respectfully dissent and would grant a new trial. The evidence presented at trial evinced the following facts. At approximately 2:20 A.M. on November 26, 1977 a man gained entrance to the house of the victim by posing as a Philadelphia police officer. Once inside, the imposter grabbed the complainant and threw her against the wall. He proceeded to choke her and said "shut up or I will kill you." The assailant pushed the victim into the dining room and ordered her to disrobe. He then forced her to kneel and commit oral sex. Before he left, the assailant gathered the victim's clothing and told her that he was taking them

---

**23.** Even if this issue were not waived, it is meritless. The sentencing guidelines apply only to crimes committed after July 22, 1982, *see Commonwealth v. Royer,* 328 Pa.Superior 60, 66, 476 A.2d 453, 456 (1984), and the crime in this case was committed in 1977.

to prove to the police that she was a willing participant, in the event that he was caught. The victim was subsequently treated at Jefferson Hospital and gave police a detailed description of the criminal, including his name.[1]

On December 10, 1977, the appellant voluntarily went with police to the Northeast Detective Division where the complainant failed to make a positive identification. Years later, the victim happened upon the appellant and identified him to the police as her attacker. The appellant was subsequently arrested on February 17, 1982, on charges of rape, indecent assault, indecent exposure, involuntary deviate sexual intercourse, burglary, aggravated assault, simple assault, and impersonating a public servant.[2] On March 9, 1983 the jury found appellant guilty of involuntary deviate sexual intercourse.[3] Post verdict motions were filed by new counsel and, following a hearing, were denied on May 29, 1984. Appellant was then sentenced to a term of imprisonment for ten to twenty years to run consecutive to any sentence he was then serving.

Appellant asserts that the trial court erred in allowing the prosecution to present the testimony of Dr. Ann Burgess. At trial, the Commonwealth called as an expert witness, Ann W. Burgess. Burgess stated that her training has been as a registered nurse in psychiatric nursing. She holds a Masters Degree in psychiatric nursing and a degree of Doctor of Nursing Science. The witness is not a medical doctor and, of course then, not a psychiatrist. Dr. Burgess

1. The assailant had identified himself while posing as a police officer. Also, the victim had recognized him as the person who came to her house in May, 1977 to give her an estimate on fixing her windows.

2. Appellant was tried only on the charge of involuntary deviate sexual intercourse because the statute of limitations had run on the other seven offenses.

3. Section 211 provided a five year statute of limitations for the crimes of sodomy and other specifically enumerated crimes, while establishing a two year limitations period for all other felonies not specifically listed. Appellant contends that involuntary deviate sexual intercourse falls within the latter category. However, as the trial court aptly noted, "[t]he crime of involuntary deviate sexual intercourse is but the crime of sodomy by another name." *Compare* 18 P.S. § 4501 (1973) *with* 18 Pa.C.S.A. § 3101 (1983).

testified concerning the phenomenon known as the "rape trauma syndrome." She described rape trauma syndrome as a set or cluster of symptoms that she and her colleague, Linda Holmstrohm, observed in rape victims. (Burgess and Holmstrohm co-authored the study, *Rape Trauma Syndrome*, 131 Am. J. Psychiatry 981 (1974) which is accredited with being the first study to describe the crises resulting from a sexual attack as "rape trauma syndrome"). Dr. Burgess testified as to extensive teaching, research, lecturing, writing and forensic experience dealing with the psychological results found in victims of rape. She stated that the Manual of Diagnostic Disorders published by the American Psychiatric Association recognizes rape trauma syndrome under its classification of post-traumatic stress response disorders and that it has done so since 1972. The rape trauma syndrome (RTS) symptoms are stated to be present in two phases: those which occur right after the rape (the acute phase) and which generally subside within a few days to weeks and the second phase (the reorganization phase), which may subsist for months or years until the victim can fully integrate the symptoms into her psychological experience so as to fully resume daily life as before the rape. The jury was told about features of the stress disorder including stress of "significant magnitude", intrusive imagery, numbing, phobias, hyperaltertness and other symptomology. Following this desription of RTS the witness stated that she had examined the victim in this case about a week previously and had reviewed the preliminary hearing notes of testimony and police reports relating to the case. Over objection, Burgess stated that it was her conclusion that the victim was suffering from rape trauma syndrome and related how certain aspects of this phenomenon bore upon the victim's post-rape history.

The court initially heard the witness outside the hearing of the jury prior to her jury testimony. At that time much of the inquiry to the witness related to her qualifications and an explanation of RTS. Inquiry was made concerning the victims' identifying her assailant. Objection was made

that the testimony of the witness was irrelevant and prejudicial in that it would tend to create sympathy for the victim: further it was objected that the testimony was improper insofar as it bore upon the identification procedures.

Indeed, it is necessary to focus on the testimony to see if it was relevant to any issue in the case and, if so, whether it was properly admitted. Regardless of the inherent reliability of the evidence, it can be argued that it is in fact not relevant. Here, there was no issue that the victim had been raped—the contention of the defendant was simply that he was not the perpetrator. In support of his defense, defendant was able to show in his case, that the victim had failed to identify him among photographs shown to the victim in her home on December 10, 1977 by two detectives. On the same date, Gallagher agreed to a one-on-one confrontation with the victim at a police station and again there was no identification. This was just two weeks after the rape which occurred on November 26, 1977. Appellant persisted in pursuit of her attacker and finally in February of 1982 made an identification from a group of photos presented by the police and later made a lineup identification. Thus clearly emerged the basic issue in the case—the victim's identification of Gallagher as the rapist.

A number of jurisdictions have dealt with the admissibility of rape trauma syndrome testimony. Most commonly, the evidence is offered to support the prosecution on the issue of consent. (If the victim exhibits the symptomology of RTS it is likely that she was in fact raped and there was, therefore, no consent). The jurisdictions are divided on this issue. The evidence has been held admissible in *State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984) and *State v. Liddell*, 685 P.2d 918 (Mont.1984). However, the weight of authority is against admissibility on the consent issue: *People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984); *Allewalt v. State*, 61 Md.App. 503, 487 A.2d 664 (1985); *State v. Saldana*, 324 N.W.2d 227 (Minn.1982); *State v. Taylor*, 663 S.W.2d 235 (Mo.1984). As these cases

demonstrate, there are serious questions to be answered concerning RTS expert testimony even when bearing upon the relevant issue of consent. Since there was no issue of consent in this case one might conclude that the expert testimony was not relevant, and should then ask if it was prejudicial and harmful, but a close examination of the evidence discloses that the Commonwealth in fact sought to use this evidence in a highly relevant manner on the core issue in the case-identification. In assessing the relevancy issue we observe that the Commonwealth has not briefed this issue on appeal, but instead relies upon the trial court opinion. The trial court in its opinion denying post verdict motions, stated that the testimony was admitted to educate the jury as to the concept and rationale of rape trauma syndrome. The court further stated (relative to the claim of impropriety of the evidence on the issue of identification) that the evidence was considered "to call the jury's attention to an injury suffered as a consequence of an assault—*especially an injury affecting the victim's abilities to relate or recall the incident* is not per se prejudicial." (Emphasis added.) Lower court op. at 19. Our examination of Dr. Burgess' testimony before the jury, does reveal that, though somewhat opaquely stated, the witness did indeed offer an expert explanation of the witness' troubles with identification:

Q. And, what about the phobia about repetition of seeing the face? Could you describe and explain that to us?

A. The—right. She had an opportunity to see the assailant's face, and, so, that imprinted, if you will, in her mind, and that is a flashback. That keeps coming back.

In fact, right after the assault, she described how this would happen, where suddenly thinking she saw someone, again a common reaction that she also had, feeling that he is everywhere, because the assault was still so new, still so fresh.

Q. How is that integrated, that phobia?

A. That becomes integrated as their time advances, and some perspective, some of the cognative, [sic] functioning

can come over, and there can be some, if you will—that's not many—some consoring, in other words, concede the person—see some facial characteristics and say, "That doesn't match. There is something different" kind of thing, and, so, that whole phenomena comes in so that over time they move from everybody is the assailant to maybe only people that have a certain characteristic, and then it subsides to they get into focus of what the person is.

It's a gradual process.

Q. Is a five-year time period a telling time period for this gradual integration process?

A. Our study of our victims showed four to six years later we had still twenty-five percent that were still very symptomatic. We had others, of course, who had recovered, but five years you still have a very—in certain areas you can have specific symptoms in the phobic area, because that's more or less the definitions of a phobia. It wards off into a particular area of symptoms.

Q. And, would that account for her flood of emotions still to this day about the material?

A. Yes. What seems to happen in the research we have been looking at is traumatic events are what is called actively stored in the mind, and when a certain, if you will, button is pressed: i.e., seeing someone, or whatever, all of that emotion and everything can just come flooding back, and that's the phenomenon of a flashback out of the past.

An event comes back, because there has been some triggering in the environment that the person is in, and it just kind of brings it all back.

Q. By bringing it all back, does it also bring the phase back of the original assailant? Is that the kind of thing that would flash right back before your eyes?

A. Oh, yes.

N.T. at 5.85–5.86 (March 4, 1983). The evidence regarding RTS was, therefore, at least facially relevant to the issue of

identification. This fact, however, does not end the inquiry as to its admissibility.

The jury heard the impressive credentials of Dr. Burgess, including the fact that she had done some of the basic research and had conducted the studies which formed the basis for recognition of the principles of rape trauma syndrome. Given the aura of confidence which lay persons naturally attach to expertise, it would be unrealistic not to conclude that the jury would seize upon Dr. Burgess' explanations to solve the critical issue of identification which faced it. The question then is whether or not the court erred in permitting expert testimony from Dr. Burgess as an aid to the jury on the issue of identification. I conclude the testimony was improperly admitted on this issue and since it was not relevant to any other issue in the case, it should have been excluded. I so conclude for several reasons. First, it must be remembered that the witness however qualified, is a doctor of nursing, not medicine.[4] Yet, the witness was permitted to give her *diagnosis* that the victim was suffering from the rape trauma syndrome and its characteristics including the crucial phobia relating to recognition of the perpetrator. The fact that the witness' studies have found some acceptance in the medical community, does not mean that the expert is *on an individual basis* qualified to render a medical, in fact, psychiatric opinion. Thus, while the witness was undoubtedly qualified

**4.** The record did not develop the area of expertise encompassed in earning a doctoral degree in nursing. Hence, I am unable to conclude unequivocally that Dr. Burgess' training would render her an equivalent of a medical doctor for evidentiary purposes.

It should be noted that in those cases which have considered the admissibility of RTS expert evidence, the witness was a physician. *See State of McQuillen,* 236 Kan. 161, 689 P.2d 822 (1984) (psychiatrist); *Allewalt v. State,* 61 Md.App. 503, 487 A.2d 664 (1985) (psychiatrist); *State v. Taylor,* 663 S.W.2d 235 (Mo.1984) (psychiatrist). *See also People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984) (court rejected RTS evidence of non-medical experts; no discussion of qualifications); *State v. Saldana,* 324 N.W.2d 227 (Minn. 1982) (court rejected RTS evidence for reasons, *inter alia,* that witness was not qualified); *State v. Whitman,* 16 Ohio App.3d 246, 475 N.E.2d 486 (1984) (court appears to approve psychiatric testimony and reject unqualified social worker testimony).

to discuss the RTS phenomenon as a result of her broad experience and work in this area, there is nothing in the record to qualify her as a medical expert, one who could examine and diagnose the mental state of an individual patient. The relevant issue before the jury was the proper identification of appellant as perpetrator of the rape. On this issue the jury was faced with the victim's seemingly inconsistent identifications and the witness is simply not qualified to give expert opinion in this area.

I recognize that in Pennsylvania, one who offers an expert may testify if there is a reasonable pretension to specialized knowledge on the subject under investigation. *Arnold v. Loose*, 352 F.2d 959 (1965).

I further recognize that the allowance of testimony by an expert witness is a matter within the sound discretion of the trial court, *Houston v. Canon Bowl, Inc.*, 443 Pa. 383, 278 A.2d 908 (1971); *Reed v. Hutchinson*, 331 Pa.Super. 404, 480 A.2d 1096 (1984), and the decision to admit the testimony should not be reversed unless the trial court clearly abused that discretion. *Junk v. East End Fire Dept.*, 262 Pa.Super. 473, 396 A.2d 1269 (1978).

Here, however, Dr. Burgess did not purport to be an expert on a victim's ability to identify.[5] Similarly, the expert did not testify to such qualifications as would permit her to testify about psychological phenomena and the diagnosis thereof. *Cf. Kravinsky v. Glover*, 263 Pa.Super. 8, 396 A.2d 1349 (1979); *Simmons v. Mullin*, 231 Pa.Super. 199, 331 A.2d 892 (1974).

More importantly, I do not believe that the RTS testimony, bearing as it does on the central issue of identification,

---

5. Recently, the California Supreme Court which had rejected rape trauma syndrome evidence (*People v. Bledsoe, supra.*) approved the usage of expert testimony as to the psychological factors which may affect eyewitness identification testimony by an expert with specific qualifications with respect to the phenomenon and characteristics of eyewitness testimony. Similarly, such evidence was approved by the Third Circuit Court of Appeals interpreting the Federal Rules of Evidence. *U.S. v. Downing*, 753 F.2d 1224 (3d Cir.1985).

is properly admissible. Viewed practically, the evidence in this case presented nothing more than an attempt to bolster the credibility of the victim by expert opinion. In a similar vein, our supreme court recently dealt with a claim of error in the rejection of testimony of a clinical psychologist who would testify as to the defendant's state of mind and intentions. In affirming the trial court's exclusion of the testimony, Justice (now Chief Justice) Nix stated:

> Traditionally, we recognized not only the jury's ability to determine the credibility of the witnesses but also we have placed this determination within their sole province. *Commonwealth v. Hampton,* 462 Pa. 322, 341 A.2d 101 (1975); *Commonwealth v. Murray,* 460 Pa. 605, 334 A.2d 255 (1975); *Commonwealth v. Oates,* 448 Pa. 486, 295 A.2d 337 (1972); *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972). To permit psychological testimony for this purpose would be an invitation for the trier of fact to abdicate its responsibility to ascertain the facts relying upon the questionable premise that the expert is in a better position to make such a judgment. Our research has failed to reveal any authority for this proposition nor has [appellee] been able to supply either authority for or persuasive arguments in support of such a position. We do not believe that a concept as fundamental to our law as trial by jury of one's peers can be cavalierly abandoned.

*Commonwealth v. O'Searo,* 466 Pa. 224, 229–30, 352 A.2d 30, 32 (1976). *See also Commonwealth v. Battle,* 289 Pa.Super. 369, 433 A.2d 496 (1981). I would therefore find that the trial court in the instant case abused its discretion in admitting the testimony of Dr. Burgess.

I would further grant a new trial because of trial counsel's ineffectiveness in failing to object to a repetitive series of accusatory outbursts by the complainant during her testimony. Given the history of her difficulty in identifying the appellant, the derisive, conclusory, and hostile utterances by complainant could only serve to impress the jury of

her certitude at trial that appellant indeed was her attacker. Counsel's restraint from objecting on the basis that it made appellant less credible in the eyes of the jury cannot reasonably be said to effectuate appellant's interests.

In addition to the improper statements set out in footnote 18 of the majority opinion, complainant, during the course of her testimony, made the following statements without objections or admonition:

He's running from me, that's what he is running from.

. . . . .

He's devious, sneaky. This is what he is all about.

. . . . .

Q. Now are you positive that the man you have identified today in this courtroom is the man that sexually assault you on November 26, 1977?

A. I am very positive.

He knows it, I know it.

Before this is over, everyone of you will know it, everyone of you will know it the way I know it.

. . . . .

I know his whole—I know how right now he can sit there and look at me like he did nothing, and I know it's playacting, and he knows it's playacting.

. . . . .

And, even in the courtroom, the first couple times I saw him in the courtroom, I cried every time he came in. The first time he came in here, I cried. I cried at the lineup when I saw him, and I just learned this week not to be afraid of him.

And, suddenly, I am at this stage where I want him to get it, and I am not afraid any more.

N.T. March 2, 3, 1983 at 391, 392, 393, 417 and 472.

I would grant a new trial.