■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GLENN FISHER, Appellant.—Judgment, Supreme Court, New York County, rendered November 21, 1978, convicting defendant of murder in the second degree and sentencing him thereupon to 15 years to life, affirmed. The underlying facts, which are not in dispute, are set forth in the dissent. Contrary to our dissenting colleague, however, we find from the totality of the evidence that defendant's guilt of this calculated and brutal murder of a hapless victim was established beyond a reasonable doubt and that no error in the admission of evidence warrants a new trial. The People's case stands on much more than Ms. Edwards' positive, albeit belated, identification of defendant as the killer. At its foundation is the relationship which had existed between defendant and Ms. Edwards. For almost four years they had been lovers, living, traveling and working together. Just four months before the killing, Ms. Edwards began to socialize with Fred Fuller. It was a relationship which was to blossom into romance and eventually an engagement to marry. During these months defendant, tormented by Edwards' growing attachment to Fuller, spoke often of suicide. He also threatened to take care of Fuller and to arrange for Edwards to know, as defendant knew, what it

was like to be left alone. Thus, a motive on defendant's part was established. That Fred Fuller was marked for death on the night in question, and was not the chance victim of a random act of violence, possibly stemming from a bungled burglary or robbery, was clearly inferrable from the frenzy of the assault perpetrated upon him. He died of a gunshot wound in the brain, and of fractures and brain contusions extending from the top to the base of the skull. According to the medical examiner, the muzzle of the gun had been placed directly against the scalp. The head wounds were severe and massive. The right side of the deceased's head was caved in, "crushed like a beer can". The skull fractures and brain contusions were consistent with the effects of six or seven blows from a blunt, round, heavy pipe. In stark contrast to Fuller's fate, Ms. Edwards was not harmed in any way. Indeed, the killer showed solicitude for her welfare throughout the incident. Moreover, it is clear that larceny was not the motive. A television, stereo system and Nikon cameras, plainly visible, were left untouched in the room where Fuller was slain. Fuller's money and credit cards, although strewn over his prostrate body, were not taken. Furthermore, the extreme lengths to which the killer went to avoid recognition point compellingly to defendant. Edwards had known defendant intimately for the past four years. Only someone who feared that Edwards might recognize him would feel the need to obliterate all his features, including the color of his eyes and his skin tone, by using a loose fitting opaque hood extending to his chest and a long-sleeved shirt and gloves, and to disguise his voice with a low, breathy whisper. Nor did any signs of forced entry into the Fuller apartment exist, thus indicating that the killer had used a key to gain access. Only days earlier defendant had an opportunity to take Edwards' keys to the apartment. Finally, defendant revealed his identity in another manner. The only items missing from the apartment were taken from Ms. Edwards' pocketbook, namely, a bottle of perfume, $17, and a key chain bearing his initial "G" and given to her by defendant. Aside from the strength of the People's evidence, the case was fortified by the implausibility of the alibi defense, as testified to by defendant and his witnesses. While it is true that Ms. Edwards did not immediately identify defendant as the killer to the police, she did testify that from the moment she saw the hooded intruder she recognized him as defendant. She also testified that she recognized defendant in the apartment by his voice. This identification was based upon a certainty that came from four years of day-to-day living together. Defendant exploited Edwards' initial failure to tell the police who the killer was by attempting to convince the jury that her identification of him was the product of police suggestion and the influence of the hypnotist and the psychiatrist. To refute this effort Dr. Carlton, the psychiatrist, was called. Ms. Edwards had testified that she had "repressed" from her mind the painful truth that defendant, the boyfriend with whom she had lived for four years, was the killer. The purpose of Dr. Carlton's testimony was to establish that Ms. Edwards' inability to make an immediate identification of defendant as the killer was consistent with the psychological phenomenon of "repression" or "blockage." Contrary to the dissent's premise, this was not a matter collateral to the issues involved in the case but rather, a material fact, emphasized by defendant throughout the trial, from his opening to the summation. An issue does not become collateral merely because it bears on credibility. For instance, a witness' ability to recount any material fact bears on the witness' credibility and yet, the fact may be proved or disproved independently. Dr. Carlton's testimony was helpful in explaining an arcane subject, not otherwise readily comprehensible, to a jury of lay

persons. He testified that he examined Ms. Edwards and that she suffered "repression" following the crime. He further testified that one can suppress not only something actually experienced, but also something believed to have been experienced. Dr. Carlton never testified, or even suggested, that he believed Ms. Edwards' testimony that she had actually recognized defendant as the killer. Thus, this is not the case of an expert witness testifying that, based on his own experience, he found the testimony of a crime victim as to the facts of the crime to be believable (cf. *People v Ciaccio*, 47 NY2d 431). In our view, Dr. Carlton did not usurp the jury's function. Concur— Fein, J. P., Sandler, Sullivan and Lupiano, JJ.

Bloom, J., dissents in a memorandum as follows: Glenn Fisher, the defendant, stands convicted of murder in the second degree. The homicide was both brutal and bizzare. Although the evidence presented a positive identification to the jury, its background was wavering and hesitant. So ambivalent is that background that, in the context of a fundamental error in the admission of evidence, I would hold that a retrial is necessitated. Fisher began to date Fernmarie Edwards, the prosecution's principal witness, early in 1973. Fisher had already received his degree from Florida State University, in Tallahassee, Florida, where he had majored in communications and theatre. Ms. Edwards was attending the University. Fisher was specializing in the field of pantomine. Because engagements were somewhat infrequent, he supplemented his income by holding down all sorts of odd jobs. Despite his uncertain income Fisher rented a house in Tallahassee. After Ms. Edwards and Fisher had dated for a brief period, Ms. Edwards disclosed that she was having great difficulty making ends meet. Fisher invited her to live at his house. Ms. Edwards accepted the invitation and, commencing in April, 1973, the two started living together. According to Ms. Edwards, the relationship between them became very close. This situation obtained until the latter half of 1976 when Fisher suggested that New York City might prove a more fertile field for his talents. Ms. Edwards acquiesced and in October, 1976, the couple arrived in Brooklyn, where they took up residence in the apartment of a friend. Shortly thereafter, Ms. Edwards was successful in obtaining a job in the Communications Department of the New York Stock Exchange. Fisher's efforts were less successful and, although the record is less than clear on the subject, it is fair to assume that the pair subsisted largely on the earnings of Ms. Edwards with minor contributions from Fisher. In the course of her work Ms. Edwards met Fred Fuller, the deceased, who was also employed in the Communications Department of the Stock Exchange. During February, 1977, the acquaintanceship began to ripen into friendship. The two began lunching together and taking brief walks after the close of business. Fisher learned of these developments and began to make teasing remarks. On May 16, 1977, Ms. Edwards and Fisher left for Quincy, Florida, to attend the wedding of Ms. Edwards' sister which, in fact, took place on May 20, 1977. Prior thereto there had been several discussions between the two in which Ms. Edwards indicated that they might be reaching a parting of the ways. On the day they left for Quincy, Ms. Edwards told Fisher that she had definitely decided to leave him. During the discussion which started before they left and continued throughout the trip Fisher exhibited anger and, according to Ms. Edwards, made a threatening remark with respect to Fuller. Sometime during this period Ms. Edwards decided that the time had come to exercise a greater measure of independence. She took a small apartment into which she and Fisher moved. The two returned to New York on May 22, 1977. During the week that followed Fisher told Edwards that he was returning to

Florida. He indicated that, because of his state of mind, he did not wish to drive back alone. He called his brother Alan, who arrived at the apartment on May 30. Fisher's belongings were loaded into his van and Fisher and Alan went to the home of a friend in Brooklyn where they stayed for the night. That very evening Ms. Edwards moved into Fuller's apartment. Prior to the parting Fisher asked Edwards if she would come to Florida on June 24, his birthday, to spend the day with him. She agreed. The following day Glenn and Alan Fisher left for Miami, where the Fisher family resided. Fisher called Ms. Edwards on the way down to Florida. In her testimony Ms. Edwards described Fisher as very depressed. Shortly before June 24 Fisher called Edwards to ask if she intended to meet him to celebrate his birthday. She agreed to meet him in Tallahassee which was geographically close to Quincy. Ms. Edwards chose Tallahassee so that she might use the occasion to visit her family. The two met in Tallahassee on Friday, June 24. They stayed at the home of friends and shared the same bedroom and bed. On that day Fisher left the house for about 45 minutes. The time span becomes important because the inference sought to be conveyed is that during this period Fisher clandestinely removed the keys to the Fuller apartment from Edwards' bag, had duplicates made and returned the originals. They spent Saturday together and on Sunday went to Quincy where they visited the Edwards family. On Sunday afternoon Fisher and members of the Edwards family went to the airport to see Ms. Edwards off on her return trip to New York. Although she indicated that she had anticipated a distressing scene at the airport, nothing of the sort occurred. Fisher was calm throughout, although he seemed sad and depressed. Ms. Edwards was met at the airport in New York by Fuller and together they went to the apartment now occupied by both of them. Sometime after June 1, Fuller and Edwards decided to become engaged. The announcement was made on Father's Day. Fuller presented her with a ring which belonged to his mother. Since it needed resizing, it was left at the jeweler's. Inasmuch as Ms. Edwards and Fuller looked forward to marriage in November or December, they spent some time looking for an apartment in New Jersey. On Tuesday, June 28, the two attended a going away dinner party for a woman who worked in their office. The dinner was completed about 8:00 P.M. and they returned to their apartment. Fuller opened the door and stepped aside to permit Ms. Edwards to enter first. She repaired immediately to the spare room used as a storage room for clothing. As she groped for the light she heard a scream followed by the words "stay calm, stay calm, we won't hurt you", uttered in Fuller's voice. In response to Fuller's urging, she entered the living room. There she saw "a man standing in the doorway, about medium height [sic], had on blue jeans, a black knit shirt. He had a black cloth hood over his head. It was [sic] no hole cut in it looked like it was thied [sic] and knotted. On the top there was like a little fabric on top and the hood fell over his face and laid around his shoulders". Since no part of the intruder's neck was visible and his hands were completely covered by gloves, she could not tell whether he was white or black. However, from his speech, which she heard later, she concluded that he was white. In the man's right hand he held a gun and in his left hand there was a shiny metal rod. The intruder motioned to her to come to him. As she responded, he indicated to Fuller that he was to lie down on his stomach. Fuller complied as Ms. Edwards was walked into a corner of the room. She knelt down facing the wall. At some point her hands were tied behind her back. A few moments later she heard Fuller cry out "my God don't" followed by two blows. While she did not see the blows, she heard them.

After about three minutes of quiet, the intruder raised her up and told her to close her eyes. He walked her to the storage room where he selected five or six scarves and led her back to the living room corner. There he had her kneel down facing the wall and tied one of the scarves over her eyes. In the process her hair became entangled in the knot of the scarf and the intruder carefully disentangled it. Some five minutes passed when she heard noises and turned to see the two men struggling. She heard blows being struck followed by two shots. At that she called out "don't hurt him, don't hurt him". Some more blows followed after which all became quiet. Moments later, the intruder held her arm to assist her in getting up. He told her to remove her shoes, led her to the bathroom, tossed a towel on the floor and instructed her to lie down. As she complied, her skirt moved up to her thighs and the intruder pulled the skirt down to her knees. In answer to her entreaty that he call an ambulance the man responded "yes, dumb white trash". Shortly thereafter the man left. A subsequent inventory of Ms. Edwards' purse disclosed that her keys which were fastened to a gold key ring given to her by Fisher, $17 and a bottle of perfume were missing. Nothing else in the apartment appeared to have been taken. In describing the voice used by the intruder Ms. Edwards testified that it was breathy. In ascribing it to Fisher she said, "It wasn't a voice that was recognized, it wasn't the sound of voice I recognized, but it was the feeling behind the voice, a tone that I recognized, that was familiar. I was reassured by it and it wasn't just what he said, but it was how he said it". After the intruder left Ms. Edwards, despite the tied-up condition in which she had been left, managed a telephone call to the police. They arrived at about 10:30 P.M. Edwards, who was in an hysterical and emotionally shattered condition, was delivered to a neighbor. After the police had completed their work at the apartment, Ms. Edwards and John Considine, a friend of Fuller's, were taken to the First Homicide Zone Office where she was questioned by Detective Bombara. Apparently she was in shock and quite hysterical. As time went on, however, she began to calm down and was able to give Bombara some indication of what had happened. In describing the intruder she said that he was 5'8" or 5'10" tall. "Then she says that's Glenn's height." In pursuing the description Edwards remembered the black knit shirt worn by the intruder as being "a shirt that Glenn had" and that he "was wearing blue jeans the same as Glenn has". However, at the trial she conceded that the distinguishing characteristic of the shirt was its embroidery and that this was not visible to her since the hood hid the area where the embroidery would have been. She also stated that although the intruder's voice had been disguised she recognized it as Glenn's voice. When asked who Glenn was she informed Bombara that he was her ex-boyfriend, Glenn Fisher. At 7:30 in the morning of the day following the homicide Fisher called the home of Mary Anne Sale and Gary Rogers from Atlanta, Georgia. It was at their home that Fisher and Ms. Edwards had stayed during the June 24 weekend. Earlier that morning Ms. Sale and Rogers had been visited by an investigator from the Tallahassee Police Department. However, no mention of that fact was made to Fisher at this time. He indicated only that he was on the way back to Florida from Atlanta and inquired whether his brother had called. At around 6:00 P.M. Fisher called again. This call, as well as a subsequent call, was made collect. On this occasion Ms. Sale referred to the police visit and asked Fisher what it might be about. Fisher indicated that he was at a loss to account for the visit but he would find out when he reached Florida. When he arrived at the Sale-Rogers home he saw the card left by the police investigator and noted that

the investigator was attached to a unit which dealt with crimes against persons. At this point Fisher displayed some anxiety and called his brother who instructed him to return to Miami. Upon his arrival Alan told him of Fuller's death. He had obtained this information through a telephone conversation with Ms. Edwards' superior at the Stock Exchange. Fisher was arrested in Miami on August 8, 1977 on the basis of a warrant issued by a New York court. While detained he was interviewed by Detectives Rosenthal and Gomez of the First Homicide Zone who sought, without avail, to obtain a confession from him. Indeed, Ms. Edwards, who apparently was a suspect at this time, was enlisted by the police in this endeavor, without any greater success. No attempt was made to effect Fisher's extradition and he was released by the Florida police. Not until February, 1978, some seven and one-half months after the homicide, was Fisher indicted; and then only after Ms. Edwards had undergone psychotherapy, hypnosis, a polygraph test (which indicated that she had spoken the truth to Assistant District Attorney Kelton and Detective Bombara when she had told them she did not know the identity of the intruder), and two visits to the psychiatrist. While the bases for the identification are somewhat tenuous, when coupled with the evidence submitted both of motive (Fisch, New York Evidence [2d ed], § 240; *People v Moore*, 42 NY2d 421, 433), and opportunity, a jury question might have been made out. However, the prosecution was not content to rest upon these elements of proof. To quiet any doubts which might arise in the minds of the jury it offered as a witness Dr. Carlton, the psychiatrist who had twice seen Ms. Edwards. He testified that Edwards had been referred to him by Michael Quinn of the Counseling and Human Development Center and that the symptoms from which she suffered following the events of June 28 were a normal reaction to the emotional trauma suffered by her. She was grieved and tearful and her reactions were particularly appropriate to the events which had taken place. He characterized this state as "repression" or "blockage" and indicated that "In the event of a great crisis or great tragedy where there are very strong emotions involved many persons, many average persons under this great strain will find that the events were too painful to deal with consciously. Under this great burden the mind will tend to repress certain facts or certain feelings. So the person becomes numb in a sense and has difficulty in thinking about certain events or feelings at the time". He indicated that an airplane crash or an airline hijacking would be classic examples. In response to a hypothetical question he voiced the opinion that the events of the night of the murder and Edwards' reaction to it were consistent with repression. Additionally, he testified that Ms. Edwards felt that she contributed to the event by failing to make a clean break with Fisher. While the prosecution carefully refrained from asking Dr. Carlton whether, in the circumstances indicated, Ms. Edwards was, in his opinion, a credible witness to the matters testified to by her, it is plain that that was the entire purpose and purport of his testimony. Its intent, and quite probably its effect, was to blunt defendant's cross-examination, thus inducing the jury to credit Ms. Edwards' identification of Fisher as the murderer. "Admissibility of evidence under our present system of law is based upon two propositions formulated by Thayer: 1) nothing is to be received which is not logically probative of some matter to be proved, i.e., irrelevant evidence is inadmissible and 2) everything which is logically probative, that is, relevant, is admissible unless excluded by a clear ground of policy or rule of law. The rules pertaining to the admissibility of evidence are thus grounded on the concept of relevancy" (Fisch, New York Evidence [2d ed], § 3). Relevant evidence is defined as evidence having

any tendency in reason to prove any material fact in issue (Richardson, Evidence [10th ed], § 4). While credibility is always in issue it is not a material fact required to be proven. Indeed it is a matter collateral to the issues involved in the trial. (People v Schwartzman, 24 NY2d 241; People v Williams, 6 NY2d 18; People v Sorge, 301 NY 198.) Because it is in issue, even though collateral to the matters in dispute, the law permits a limited attack for the purposes of impeachment (People v Davis, 44 NY2d 269; People v Duffy, 36 NY2d 258; People v Sandoval, 34 NY2d 371). However, I know of no authority in this State, and none has been brought to my attention, which suggests that evidence is admissible for the sole purpose of buttressing credibility. Indeed, such authority as there is would indicate that the contrary is the law (see People v Williams, 6 NY2d 18, supra). In that case one Giles had purchased a packet of heroin from the defendant at the defendant's home in Queens. Giles was followed by policemen who arrested him in Manhattan. Thereafter, Williams was charged with the sale and Giles was called upon to testify against him. Williams sought to impeach Giles' testimony by offering expert medical evidence that a person addicted to heroin was not worthy of belief. The testimony was excluded and Williams was convicted. In affirming the conviction Chief Judge Conway noted (pp 26-27) that "the expert testimony proferred here is not usual at all. It is not as to a fact in issue, as such, but as to a collateral matter, viz., the credibility of a witness * * * How complex and confusing would a trial become for the jury if it were faced with conflicting expert opinions, each with scientific authority to support it, upon the collateral matter of credibility. The first question would be the credibility of the experts, and then the credibility of the witness. The battle of the experts might well be such that the jury would lose sight of the issues or, at the very least, would tend to regard the opinion of the expert as determinative of the credibility of the witness rather than to consider it only as one factor of many to be considered in concluding whether a witness is telling the truth". In this case Fisher made no endeavor to call an expert on the issue tendered by the prosecution. However, the validity of the ruling is to be measured by what could have been done under it and not by what actually was done. By this standard we would have a trial within a trial in which the ultimate fact to be determined would be submerged to the detriment of the trial process. In the circumstances here indicated, I am of the opinion that, by offering the testimony of Dr. Carlton as to the mental condition and processes of Ms. Edwards at the time of the murder and thereafter, thus buttressing her initial hesitant and ambivalent identification of the defendant as the murderer, the prosecution may well have created "a very substantial likelihood of irreparable misidentification" (Manson v Brathwaite, 432 US 98, 116; Simmons v United States, 390 US 377, 384). A retrial is, therefore, required. As to the other matters raised by defendant, I agree with the majority that the trial court's rulings were proper.