In the Matter of NICOLE V., a Child Alleged to be Abused.
LAWRENCE V., Appellant.

First Department, January 8, 1987

### APPEARANCES OF COUNSEL

*Eugene L. Scancarelli* of counsel *(Scancarelli & Jacobson,* attorneys), for appellant.

*Elizabeth S. Natrella* of counsel *(Larry A. Sonnenshein* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for petitioner.

*Barbara H. Dildine* of counsel *(Leonore Gittis,* attorney), *Law Guardian,* for Nicole V.

### OPINION OF THE COURT

CARRO, J.

On July 6, 1984, a child protective proceeding was commenced, pursuant to Family Court Act article 10, by the filing of a petition alleging that the respondent, Larry V., sexually abused his 3½-year-old daughter Nicole within the meaning of the Penal Law. A fact-finding hearing was held on January 17, 1985 and February 14, 1985. Petitioner, Department of Social Services, presented three witnesses: Nicole's mother, Linda V.; Sharan Champ, Nicole's caseworker; and Patricia Lemp, Nicole's therapist.

Ms. Champ, a Special Services for Children caseworker, interviewed Nicole on July 5, 1984. Nicole told Ms. Champ about games she played with her father in the bathroom of his parents' home during overnight visits with him. Nicole's mother and respondent were separated and respondent had overnight visitation of Nicole at his parents' home on weekends. Nicole explained to Ms. Champ that she and respondent would do "cocky" and then she would get down on all fours and play like "Hobo," the family dog. According to Nicole, respondent would then "put white paste on me, on my mouth and all over me." Nicole told Ms. Champ that he put the paste

around her "chach," which she indicated was her name for her genital area. When asked where the white paste came from, Nicole answered that it came from her father, and she again pointed to her genital area to show from what part of his body the "paste" came. When asked if she had ever played such games with anyone else, Nicole replied: "no one else."

Pat Lemp, a certified social worker, was qualified, without objection, as an expert in counseling sexually abused children. Ms. Lemp holds a bachelor's degree in "deviant behavior and social control" from John Jay College of Criminal Justice and a Master's degree in social work from Columbia University. At the time of the hearing, Ms. Lemp was director of the Bronx community office of the Victim Services Agency and had been treating sexually abused children for 2½ years. She was also the chairperson of the education committee of the New York City Task Force Against Sexual Abuse. By the time of the hearing, Ms. Lemp had been counseling Nicole for over four months, usually on a weekly basis, and had seen Nicole approximately 10 times.

Ms. Lemp's professional opinion was that Nicole had been sexually abused, an opinion based on Nicole's statements and observations of her behavior during therapy sessions. The beginning of the therapy was marked by Nicole's withdrawn behavior. As the therapy progressed, Nicole related the "secret games" she played with her father. Ms. Lemp testified: "One of the things that [Nicole] told me is that her daddy put glue in her mouth. And, again when I asked her to be more specific about it she said—I asked her where did the glue come from and she said, 'From down here,' indicating her own genitals. And I said 'from you Nicole?' And she said, 'No, from my daddy down there.' She also talked about her daddy touching her in the places where he shouldn't have touched her indicating the area of her genitals, her chest, her buttocks." Nicole often discussed these events with Ms. Lemp and never contradicted her story.

The behavioral signs Ms. Lemp noted in Nicole, which she testified were symptomatic of a sexually abused child, included: knowledge of sexual activity beyond the child's developmental stage; extreme anger and depression; bed-wetting; and sleep disturbances and nightmares involving her father. Ms. Lemp witnessed several temper tantrums during which Nicole pulled her hair and hit herself, actions Ms. Lemp characterized as being substantially more severe than those of other children Nicole's age. When asked why she felt so

angry, Nicole stated: "I feel so angry about what my daddy did to me." After one of these temper tantrums, provoked because the elastic cuffs on her shirt were too tight, Nicole told Ms. Lemp that her father tied her wrists with her jump rope when "he played the bad games." On another occasion, when asked why she would not allow herself to be photographed, Nicole answered that when her father played the games, "he took bad pictures, but the camera did not work."

Based on her study and treatment of children, Ms. Lemp opined that a child of Nicole's age would be unlikely to fantasize about or fabricate sexual activity, since "there needs to be a basis in reality for a child of the age of three and a half to come up with details of sexual experience." She also observed that children of that age are unable to lie consistently over a period of time to several people.

Nicole's mother testified that Nicole was 2½ years old when she and her husband separated in 1983, by which time Nicole was fully toilet trained. The separation did not cause Nicole to regress in her toilet training. Yet, about the beginning of 1984, Nicole began to wet her bed. The bed-wetting would occur in the beginning of the week, after Nicole's weekend visits with her father. Nicole also became prone to vaginal rashes, which also consistently appeared after weekend visits. On one occasion, after Nicole's return from a visit with her father, Nicole's mother noticed blood on the washcloth after washing Nicole's vaginal area. Upon asking respondent what had happened to Nicole, respondent said she had gotten a splinter, although an external examination of the child did not reveal anything of this nature. Nicole's mother also noticed that Nicole exhibited some apprehension about going with her father on overnight visits.

It was on June 28, 1984, while on vacation in Florida, that Nicole told her mother of the "games" her father played with her. On that day, Nicole's uncle was babysitting her, that being the first time Nicole was left alone with any male other than her father. Nicole told her uncle that she "wanted to play a secret game" with him that she played with her father. When Nicole's mother returned to her sister's house, she was told what Nicole had said. Nicole's mother then had a conversation with Nicole in which Nicole related that her father told her he would give her a "very bad spanking" and "kill her" if she told anyone of their secret game. After assuring her that no one would hurt her, Nicole told her mother that her father "put his chach (phonetic) in her chach (phonetic)" and that

"she had glue in her mouth and the glue was running in her ear." Upon returning home, Nicole's mother immediately filed a report of suspected child abuse.

Respondent denied all accusations and even denied ever having been alone with his daughter in his parents' home for more than a few minutes. He admitted only to having applied Desitin and suntan lotion to Nicole. He had no idea how Nicole might associate "white paste" as something coming from his genital area.

The trial court determined that Nicole's statements made out a case of sexual abuse in the first degree as defined in Penal Law § 130.65 and that her testimony was sufficiently corroborated by the testimony of Ms. Lemp, Nicole's behavioral patterns, the mother's finding of blood on a washcloth and the introduction of a hospital report confirming that Nicole had no hymen.

At a dispositional hearing, held June 28, 1985, the court entered an 18-month order of protection against Lawrence V., prohibiting him from visiting Nicole in her home for 18 months, but permitting supervised visitation, to be arranged by Special Services for Children, "if and when appropriate."

Family Court Act article 10, entitled Child Protective Proceedings, popularly named the "Children's Bill of Rights," was enacted in 1969 to address the serious problem of abused and neglected children. It establishes procedures which are civil in nature "to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being" and to determine "when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met." (Family Ct Act § 1011; *see, People v Smith,* 62 NY2d 306, 311.)

Although many due process protections are afforded to parents or guardians against whom proceedings are commenced, they are not entitled to findings based on proof beyond a reasonable doubt or to a jury trial. Recognizing that no criminal sanctions are imposed in these proceedings, that permanent termination of parental rights does not occur, and that the paramount concern is the immediate safety and well-being of the child, the Legislature has provided that findings of child abuse are to be based on a preponderance of the evidence. (Family Ct Act § 1046 [b].)

A sexually abused child is defined under article 10 as one under the age of 18 whose parent, or other person legally

responsible for his or her care, commits or allows to be committed against the child a sex offense as defined in the Penal Law. (Family Ct Act § 1012 [e] [iii].) The statute specifies, however, in no uncertain terms, that the corroboration requirements contained in the Penal Law shall not apply to proceedings under article 10.

Because investigations of intrafamilial child sexual abuse quite frequently fail to uncover any eyewitnesses to the act or physical evidence of abuse, leaving in most cases the out-of-court statements of the victim as the strongest evidence of sexual abuse, article 10 creates an exception to the hearsay rule, providing that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence, but if uncorroborated, such statements shall not be sufficient to make a fact-finding of abuse or neglect. Any other evidence tending to support the reliability of the previous statements, including, but not limited to the types of evidence defined in this subdivision shall be sufficient corroboration. The testimony of the child shall not be necessary to make a fact-finding of abuse or neglect". (Family Ct Act § 1046 [a] [vi].)

While various trial courts and other Appellate Divisions have addressed the issue of what constitutes sufficient corroboration of a victim's out-of-court statements in a child protective proceeding, this issue has not yet been addressed by this court.

Corroboration rules exist "to further considerations of public policy, and the amount of corroboration to be required varies with the policy sought to be served by the requirement." *(People v Daniels,* 37 NY2d 624, 628.) From our reading of the language of article 10 and in light of the shift in attitude, over the last decade, towards the credibility of the testimony of sexually abused victims, we conclude that the policy served by requiring corroboration of a victim's out-of-court statements in a child protective proceeding is to assure that a fact-finding determination is not being made on the basis of hearsay evidence alone.

The aforementioned shift in attitude towards the testimony of victims of sexual abuse has resulted in a change in the corroboration requirements in criminal cases. Thus, in enacting chapter 14 of the Laws of 1974 which added section 130.16 to the Penal Law, the Legislature eliminated the requirement of corroboration in cases of forcible rape, sodomy and sexual

abuse. Then Governor Wilson, in approving enactment of this new law, stated: "Furthermore, the implicit suggestion in the corroboration rule that the testimony of women, who are most often the complainants in sex cases, is inherently suspect and should not be trusted without the support of the independent evidence, is without justification and contrary to our strong belief in the principle of complete equality for women in our society." (Governor's approval mem No. 2, Feb. 19, 1974, approving L 1974, ch 14, § 1, 1974 McKinney's Session Laws of NY, at 2078; *see also, People v Daniels,* 37 NY2d, at p 629, n 1.)

A further liberalization of the criminal corroboration requirement in sex offense cases occurred in 1984, when an amendment to Penal Law § 130.16 repealed the requirement for corroboration of the testimony of a child victim of a sex offense. (L 1984, ch 89, § 1.) This change reflected the Legislature's deep concern with the plight of abused children and its appreciation that their testimony should not be viewed suspiciously.

In fact, a substantial body of literature has noted that because of the difficulty young children experience in revealing an act of sexual abuse, especially against a parent, and the usual lack of knowledge very young children have of sexual activity, experts have encountered very few incidents of false allegations. *(See, e.g.,* Sgroi, Handbook of Clinical Intervention in Child Sexual Abuse, at 42, 43, 72 [1982]; McCabe, Cohen and Weiss, Child Sexual Abuse, at 54-57 [1985]; Sloan, Protection of Abused Victims: State Laws and Decisions, at 108-109 [1983]; Burgess, Groth, Holmstrum and Sgroi, Sexual Assault of Children and Adolescents [1978].)

In drafting the language that it did with respect to corroboration in child protective proceedings, the Legislature again rejected the unfounded and antiquated notion that a child's statements of sexual abuse are inherently suspect and require strict corroboration. The first indication that the corroboration requirement was not intended to be an unduly strict one appears in the definitional section of the statute, Family Court Act § 1012, in which a sexually abused child is defined with reference to the Penal Law definitions of sexual offenses. This section, enacted before the above-mentioned amendments to Penal Law § 130.16, goes on to state very clearly, however, that the Penal Law requirement of corroboration in sex offense cases, a strict corroboration test, does not apply. (Family Ct Act § 1012 [e] [iii].)

Despite this, many early Family Court decisions erroneously adopted the criminal standard of corroboration as applied in sex offense cases. *(See, e.g., Matter of Fawn S.,* 128 Misc 2d 186, 188, *revd* 123 AD2d 871; *Matter of Nicole S.,* 123 Misc 2d 364, 368.)* In response, the Legislature amended Family Court Act § 1046 (a) (vi) to add the following language to its corroboration requirement: "Any other evidence tending to support the reliability of the previous statement * * * shall be sufficient corroboration."

A number of observations can be made. Family Court Act § 1046 (a) (vi) is by nature remedial in that it permits a relaxation of the hearsay rule with regard to prior statements of a victim, thus reflecting the Legislature's regard for the general trustworthiness of such statements. In requiring corroboration of such statements, however, the statute is addressing the inherent weakness of and judicial discomfort in basing a factual determination solely on hearsay evidence. Furthermore, the breadth of the added language, permitting corroboration by "[a]ny" evidence "tending" to support the reliability of the statement, indicates that the Legislature envisioned a very flexible standard of corroboration, a vision consistent with the remedial nature of this section, but, more importantly, consistent with the primary purpose of article 10 proceedings, vis., to protect physically and emotionally endangered children.

There are other factors which point heavily in favor of a flexible corroboration rule. Rarely will a case of intrafamilial sexual abuse be proven by an eyewitness or physical evidence. Also, young children sexually abused by a parent typically and understandably experience great difficulty in testifying to such abuse in open court. Thus, the only really meaningful evidence of abuse may be the out-of-court statements of the victim. Requiring strict corroboration, given the difficulty of proof in these cases, would utterly defeat the purpose of article 10 proceedings, which purpose can only be achieved by tipping the balance between the rights of children and of their parents in favor of protecting the children.

Thus, in applying a flexible corroboration test, if the burden of rebutting a prima facie case falls more on the parent than on the child, it is an inevitable and necessary risk in effecting the statute's important public policy purpose of protecting an abused child. The worst result of an erroneous finding against a parent will be the temporary loss of custody for no more than 18 months, during which time supervised visitation is

possible. However, the result of an erroneous fact finding in favor of a parent is to permit a helpless, abused child to remain in or be returned to the custody of an abusive parent without the protection of State intervention. Such a result society cannot tolerate.

■ Because due process requirements must vary with the subject matter and necessities of the situation *(Matter of Cecilia R.,* 36 NY2d 317, 322), and these Family Court proceedings are designed to protect victims from further harm, not punish the offenders or even terminate their parental rights permanently, we conclude that due process requirements are met by permitting a finding of abuse to be made on the basis of a child's out-of-court statement which is corroborated by any competent, nonhearsay, relevant evidence, which confirms that the child has been sexually abused and enhances the credibility of the child's statement as to its material elements. Whether or not sufficient corroboration exists is a determination to be made on a case-by-case basis. It is not necessary that specific evidence, outside of the child's statement, exist as to the identity of the abuser, as long as the totality of the evidence provides strong confirmation of the credibility of the child's statements concerning commission of the act and the identity of the abuser.

Strong corroboration may exist in the form of medical proof of such injuries or conditions as would not otherwise exist except by reason of the acts or omissions of a parent or other person responsible for the care of such child, which injuries are given a res ipsa loquitur effect by Family Court Act § 1046 (a) (ii). For example, proof that a five-year-old girl contracted infectious gonorrhea, while in the custody of her father, was found to be corroborative of that child's out-of-court statements of abuse. *(Matter of Tara H.,* 129 Misc 2d 508, 512-513; *see also, Matter of Joli M.,* 131 Misc 2d 1088 [pregnancy].)

In a Third Department case, proof of sexual abuse of an older daughter, supported by the father's admissions, was admissible on and corroborative of the issue of abuse of the father's younger daughter. *(Matter of Cindy JJ.,* 105 AD2d 189, 191; *see also, Matter of Tantalyn TT.,* 115 AD2d 799, 801.) The Second Department has on a number of occasions held that a child's in camera interview can supply sufficient corroboration regarding abuse. *(Matter of Tina H.,* 123 AD2d 864; *Matter of Fawn S., supra; Matter of Dana F.,* 113 AD2d 939, 940-941.) The Third Department appears to be in agreement

on this issue. *(Matter of Tantalyn TT., supra,* at p 801.) We agree that corroboration may take any of the above forms.

In many instances, however, where there is a lack of medical evidence or inconclusive medical reports, no eyewitnesses, no admissions from the accused parent and a reluctance on the part of the victim, due to age and posttraumatic stress, to testify in court or in camera, the importance of testimony by an expert, based on what has come to be called the "validation interview," will be critical. "Validation" is defined as the "process by which an expert confirms or fails to confirm the existence of 'intrafamilial child sex abuse syndrome' ", and wherein "[t]he validator determines the existence of posttraumatic stress, from a cluster of behaviors." *(Matter of Michael G.,* 129 Misc 2d 186, 192, quoting from Sgroi, Handbook of Clinical Intervention in Child Sexual Abuse [1982].)

Based on the general rules for the admission of expert opinions and, in particular, the increasing receptivity in this State to admission of expert testimony on psychological phenomena not easily understood by the finder of fact *(see, People v Keindl,* 68 NY2d 410 [psychological reactions of children sexually abused by a stepparent]; *People v Henson,* 33 NY2d 63, 73-74 [battered child syndrome]; *People v Ciervo,* 123 AD2d 393 [battered wife syndrome]; *People v Reid,* 123 Misc 2d 1084, 1085-1088 [rape trauma syndrome]; *People v Fisher,* 73 AD2d 886, 887-888, *affd* 53 NY2d 907 [phenomenon of repression]), we conclude that the testimony of experts concerning the child sexual abuse syndrome is admissible on the issue of whether a child has in fact been sexually abused and to corroborate that child's prior statements.

Expert opinions are admissible on issues involving "professional or scientific knowledge or skill not within the range of ordinary training or intelligence." *(Dougherty v Milliken,* 163 NY 527, 533; *see also, People v Keindl, supra; De Long v County of Erie,* 60 NY2d 296, 307.) A witness qualifies as an expert if he or she possesses "the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable." *(Matott v Ward,* 48 NY2d 455, 459.)

In *People v Henson (supra),* the Court of Appeals recognized that extensive research had been undertaken in the area of physically abused children, which research was able to isolate common characteristics shared by physically abused children *(supra,* at pp 73-74). The court noted that the term "battered

child syndrome" had become an accepted medical diagnosis *(supra,* at p 73). Evidence that a child demonstrated such characteristics, coupled with the fact that the child's injuries occurred while in the custody of the parents, was held sufficient to permit the inference that the parents were responsible for the injuries *(supra,* at p 74).

Similarly, in *People v Reed* (123 Misc 2d 1084, *supra)* the court noted that extensive scientific research had also been conducted with respect to "rape trauma syndrome", which explains the unique reactions of rape victims, reactions not within the common understanding or experience of persons of ordinary intelligence and experience *(supra,* at p 1086). Such expert testimony was held to be admissible on the issue of whether the complainant suffered from that syndrome and was, therefore, a victim of rape *(supra,* at p 1087). It is noteworthy that in both these instances the expert testimony was found to be of help to the trier of fact in assessing the reliability of the complainant's allegations.

As in these areas noted above, a substantial body of literature also exists with respect to the sexually abused child. The research in this area has prompted the American Medical Association to adopt, in December 1984, diagnostic guidelines with respect to child abuse. *(See, Report of the Council on Scientific Affairs, AMA Diagnostic and Treatment Guidelines Concerning Abuse and Neglect,* 254 JAMA 798 [1985].) The psychological and behavioral characteristics and reactions typically shared by victims of child abuse in a familial setting is information not generally known by the average juror. Because of the taboo nature of incest, it is not a subject about which the average person is well informed, nor is it a subject that most persons even feel comfortable discussing.

Thus, in *People v Keindl (supra,* p 422) decided November 20, 1986, the Court of Appeals held that the trial court had not abused its discretion when it "ruled that the range of psychological reactions of child victims who suffer from sexual abuse at the hands of their step-parents is not a subject matter within the ken of the typical juror, and therefore may be addressed by expert testimony." Likewise, we hold that the opinion of an expert on intrafamilial child sexual abuse syndrome is admissible on the issue of whether a child is the victim of intrafamilial sexual abuse, as confirmed by the presence of certain symptomology discovered through the validation process, and that expert opinion can be used to corroborate the child's prior statements.

Of course, the expert witness must be qualified to testify in this area through training, experience and the use of a reliable methodology through which his or her conclusions are reached. Furthermore, he or she must demonstrate that the conclusions made are the product of that methodology or system of analysis. Whether the validation testimony may in itself be sufficient corroboration of a child's out-of-court statements is a question we need not address here, since the record before us contains other corroborating evidence.

■ Nicole's out-of-court statements of sexual contact by her father were corroborated by substantial medical evidence. There was a hospital record establishing that Nicole had no hymen. There was a documented history of persistent vaginal rashes, which often appeared on the days following weekend visitations with respondent. On one occasion after a visit with respondent, Nicole's mother discovered blood on a washcloth after washing Nicole's vaginal area.

The validation evidence was especially corroborative of Nicole's statements. The testimony was given by a person well qualified, as noted *ante,* in treating sexually abused children. Her opinion regarding Nicole was based on at least 10 therapy sessions spanning a period of four months. Ms. Lemp's opinion that Nicole was sexually abused was based on the nature of the statements the child made, their consistency over a period of time and her observation of certain behavioral patterns in Nicole. Ms. Lemp explained that among the symptoms manifested by children who are sexually abused in an intrafamilial setting are: age-inappropriate knowledge of sexual behavior, manifested verbally, in play activities or through drawings; enuresis (bed-wetting) in a toilet trained child; regressive behavior and withdrawal; and severe temper tantrums and or depression inappropriate for children of like age.

One of the classic symptoms of a sexually abused child, which Ms. Lemp observed early in Nicole's therapy, was her uncommunicative, withdrawn stance, a typical avoidance mechanism adopted by persons suffering from posttraumatic stress. Extremely indicative of her having been sexually abused was Nicole's knowledge of sexual activity far beyond the norm for 3½-year-old children. Ms. Lemp opined that children of such age have no basis for knowing details of sexual activity, unless there was a basis in reality for such behavior. Nicole's statements of "white glue" or "paste" coming from her father's genital area and his placing his penis in her vagina demonstrate specific knowledge of sexual activity

unusual for a child her age and unusual for a child with no experience in sexual activity.

Also symptomatic of an abused child is enuresis. Nicole, although fully toilet trained, began to wet her bed well after her mother and father had separated and beginning a few months before the sexual abuse was discovered. There was no physical explanation for this regressive behavior and no explanation of why it occurred only on the days following overnight visits with her father.

One symptom Ms. Lemp was able to observe on a firsthand basis was Nicole's display of extreme anger far exceeding the temper tantrums normally seen in young children, during which Nicole would even pull her hair and hit herself. Nicole told Ms. Lemp that she was "angry about what my daddy did to me." Fearful behavior was exhibited through Nicole's nightmares and sleep disturbances, again, according to Ms. Lemp, symptomatic of an abused child.

Regarding the fact that Nicole repeated her claims to various people over a period of time and in a consistent manner, Ms. Lemp, based on her training, study, and counseling of very young children, noted that children "do not have the skill at lying that adults do" and thus "cannot be consistent [about lying] for a period of several months to several different people." While this conclusion directly related to Nicole's credibility, it was based on professional, objective experience, and was for the trier of fact to accept or reject based on an assessment of the expert witness' qualifications and the facts of this particular case. (See, People v Parks, 41 NY2d 36, 47-48 [a witness may assist the trier of fact in assessing a complainant's credibility as long as the testimony is based on "scientific and objective data" and the witness does not vouch for the complainant's credibility, a matter to be determined by the trier of fact].)

The record also demonstrates that respondent, who introduced no evidence except a general denial to rebut the allegations of abuse, also introduced no evidence to support his suggestion that Nicole may have been manipulated into lying as part a custody battle. Nicole's father had always been granted liberal visitation rights both at Nicole's mother's home and at his parents' home. There was even testimony that he remained overnight on at least one occasion at Nicole's mother's home, a fact indicative of a nonacrimonious relationship. Until the allegations of sexual abuse were made,

no attempt had ever been made to restrict respondent's contact with Nicole. With reference to the possible fabrication of the sexual abuse charges as part of a possible custody battle, we credit the expert witness' opinion that very young children do not have the skills of prevarication, nor can they easily be manipulated into fabricating a story consistently to so many persons over an extensive period of time, especially a fabrication about one's own parent.

Based on the totality of all the evidence presented, the victim's statements, the corroboration from the medical evidence and the validation testimony, we conclude that the Family Court's finding of sexual abuse was supported by a preponderance of the evidence and must be affirmed.

Accordingly, the dispositional order of the Family Court, Bronx County (Donald F. Mohr, J.), entered June 28, 1985, which found that respondent had committed sexual abuse in the first degree against his daughter and prohibited him from any visitation with her, unless supervised, for a period of 18 months, should be affirmed, without costs and without disbursements.

KUPFERMAN, J. P., SANDLER, ROSS and KASSAL, JJ., concur.

Order of disposition of the Family Court of the State of New York, Bronx County, entered on June 28, 1985, unanimously affirmed, without costs and without disbursements.