In the Matter of RYAN D., a Child Alleged to be Abused.

Fourth Department, February 27, 1987

### APPEARANCES OF COUNSEL

*Milo Tomanovich (Edward D'Amico* of counsel), for appellant.

*Culley, Marks, Corbett, Tanenbaum, Reifsteck & Potter (Karen Smith Callahan* of counsel), for respondent.

*John Rivoli, Law Guardian.*

## OPINION OF THE COURT

Pine, J.

Ryan D. was not quite five years old when he communicated to Monroe County Department of Social Services child protective caseworker Thomas Corbett by words and demonstration with anatomically correct dolls that his father, Paul D., had been sexually abusing him. The next day, the Department filed a petition against respondent father in Monroe County Family Court pursuant to Family Court Act article 10; subsequently an eight-day fact-finding hearing was held.

The court reserved decision on respondent's motion to dismiss the petition at the end of petitioner's case, and at the conclusion of all the proof it granted the motion to dismiss on the ground that the only evidence which could under any circumstances be used as corroboration was the testimony of Phyllis Schiff, a psychiatric social worker, and that her opinion was based on the statements of the child to Corbett, the very evidence which required corroboration.

The court erred in granting the motion and in failing to grant the petition. There was ample corroboration within the meaning of Family Court Act § 1046 (a) (vi) of the child's out-of-court statements in the testimony of Suzanne, the child's mother; Dr. Linda Bennett, a child psychologist who treated Ryan; and Phyllis Schiff; and the preponderance of the credible evidence supports the petition.

### CORBETT'S TESTIMONY

Corbett spoke to Ryan at Genesee Hospital after the Department received a report of suspected child abuse from Suzanne. Ryan told him that he had seen a movie at his nursery school about good, bad, and confusing touches and said he had a secret about confusing touches that involved his father. According to Corbett, Ryan was reluctant at first to give specifics and said he had been told by his father not to discuss this with other people. Corbett testified as follows: "[T]here were times that he was with his father where his father would lower both of their pants like that and touch the penises of each other together. He demonstrated that with the dolls by holding them face to face so that the penises were touching each other. He said that his father would kiss him on the lips at those times and he demonstrated that also. He said that

further there were times that his father would have him lay down face down on a bed with his pants down around between his knees and his ankles and that father would be dressed the same way with his pants down and lay down on top of him. He—and he showed that with the dolls. He was very—took deliberate pain to be very specific about the placement of the penis against his rectum and very careful about doing that. He said this is what happened during the secret." The child further said that when those things would happen with his father "it felt weird", and that he would count sheep in an attempt to not think about what was happening with him. Corbett said Ryan seemed intelligent, spoke freely to him, and had no trouble understanding and answering questions.

### SUZANNE'S TESTIMONY

Suzanne testified that when she and Paul separated in May 1982, when Ryan was a year old, Ryan usually visited Paul two nights a week. She took Ryan, at age three, to Dr. Bennett in November 1984 to be sure the child was handling the separation well. In February 1985 Ryan began to cry, kick and scream when it was time for visitation and he behaved very aggressively. He talked quite a bit about nightmares in which a monster named Paul came into his room at night at his father's home, and the monster repeatedly poked a sword in his back and his belly; Ryan said he would have to wait until it was light out before it would be okay. He demonstrated what was bothering him by using two stuffed animals lying down together moving harder and harder. Ryan said that Buddy, the little stuffed animal, would watch television to avoid paying attention to what was happening to him. The child grimaced and made gagging sounds while demonstrating this. Suzanne asked Ryan whether anything was happening to him and he replied that he could not tell her because it was a secret and because it would make her too sad.

During the same period Ryan told Suzanne his bottom hurt, and she observed that it was red. Ryan was evasive when asked why and told his mother that he could not talk to her about it. He also expressed to her for the first time that he thought he was not a good boy.

The child also drew pictures during this time. One picture the child described as a gun and said that the smoke coming out of it wasn't regular smoke but wet smoke, not like water but like cream. He also drew a picture of a house over and

over, about 50 times. With each picture the child became more upset, and started smashing his pen into the paper. The child asked the mother if the pictures looked like a house to her. The mother testified that the drawings did not. She said what he drew looked like a penis. She gave the drawings to Dr. Bennett.

Suzanne repeatedly expressed concern to Paul about the child's behavior; Paul told her he could not understand it and otherwise showed no reaction.

The child's behavior improved during the summer of 1985 but after Ryan saw the movie about touching in nursery school on February 7, 1986, he told Suzanne that someone had subjected him to penis to rectum contact. Ryan was very nervous, walking around the table and making a gagging sound, as he mentioned Paul's girlfriend's brother Mark and blurted out two other names. He did not say that Paul was involved. Suzanne reported this to Paul and asked whether he could think of anything that could account for Ryan's statements. Paul responded as if Suzanne were making up Ryan's words.

Suzanne made a protective referral. Until Ryan told Corbett that his father had abused him, Ryan repeatedly insisted to Suzanne that the reason he did not want to visit his father was a secret.

### BENNETT'S TESTIMONY

Dr. Linda Bennett saw Ryan three times between November 1984 and January 1985. The child had been subjected to stress because Suzanne had been hospitalized for alcohol treatment before the parents separated. Dr. Bennett concluded at that time that Ryan was experiencing an adjustment reaction with some withdrawal and mild anxiety.

She saw Ryan again in March 1985, when Suzanne reported that he was experiencing nightmares, was displaying increasing aggressive behavior, and was resisting visitation with his father. Bennett observed that he was very aggressive and angry, and Ryan told her he needed lots of muscles to defend himself. He said he was not ready to see his dad, but would go again.

Bennett, who acknowledged that she was not an expert in child abuse, met with Paul at that time and told him that the child's expressed need to develop muscles and feeling of helplessness and suggestions of sexuality in some of Ryan's play

might be an indication of sexual abuse. Paul's response was that nothing like that could have happened.

Bennett's opinion that sexual abuse was a possibility was based on Ryan's increase in anxiety and fearfulness, nightmares, change in appetite, his refusal to interact with others as he had previously, and his increase in aggressive behavior, centered upon his feeling that he could not protect himself. These facts led Dr. Bennett to believe that there was some more powerful force possibly acting on him than just a parental separation or worrying about his mother's health and drinking.

Ryan complained once to Bennett that his bottom was sore and he was very tearful and clingy. He told her again he had a secret he could not reveal. In November 1985 Ryan told her his secret was that one of the boys in his class had been bullying him.

### SCHIFF'S TESTIMONY

Phyllis Schiff, a manager at Family Service, holds a Master's degree in psychiatric social work and originated the TASA program, an acronym for therapeutic alternatives to sexual abuse. The program deals with intrafamilial child sexual abuse. She has done extensive staff training and consultation throughout New York State and did all initial intake of child sex abuse cases for the first three years of the program. She has treated between 50 and 80 families in which intrafamilial sexual abuse has occurred.

Schiff testified that disclosure is the most important factor in diagnosing child sexual abuse. She said there is usually a delay in disclosure and a great reluctance to disclose when a parent is the perpetrator. Children often retract due to pressure or fear of offending the parents who have abused them and usually demonstrate a lot of fear and anxiety after disclosing; they often ask the person to whom they have disclosed not to tell anyone else. Another factor is change in behavior, including depression, acting out, and sleep disruption. Children who were outgoing become depressed or withdrawn, and report sleeplessness and bad dreams. Younger children behave differently from older ones, tending to be less direct in their disclosure and very reluctant, after they have told, to tell again. They are more defensive and magical in their thinking than older children.

Schiff attempted to interview Ryan two weeks after the

petition was filed. She found him fairly articulate for a 4½ year old, and friendly, but as soon as she tried to elicit the kind of information he had given to the protective caseworker, the whole tone of the conversation changed, and she terminated the interview so that Ryan could relax. From her interview she was not able to validate that Ryan had been sexually abused by his father.

Schiff was asked a hypothetical question in which she was asked to assume, among other facts, that the child had told a protective worker that: "his father rubbed his penis against the child's penis while kissing on the lips and further, the father placed his penis against the child's rectum and moved it around; assume further that the child also demonstrated with anatomically correct dolls the father doll rubbing its penis against the boy doll's penis and placing the father doll's penis against the child doll's rectum and moving it around; assume further that the child tells the protective worker that his father told him to keep these things that they were doing a secret." Schiff opined that the child was a victim of intrafamilial child sexual abuse.

## I

### Ryan's out-of-court statements were adequately corroborated

Corroboration refers to the quantum of proof and the amount of corroboration required by law depends on the context (see, People v Daniels, 37 NY2d 624, 628). Family Court Act § 1046 (a) (vi) was amended in 1985 to make clear that a standard of corroboration less stringent than that applicable to criminal prosecutions was intended in child protective proceedings (1985 NY Legis Ann, at 260). The policy served by requiring corroboration of a victim's out-of-court statements in a child protective proceeding is to assure that a fact-finding determination is not being made on the basis of hearsay evidence alone (Matter of Nicole V., 123 AD2d 97).

Adequate corroboration under article 10 can take many forms. "It is not necessary that specific evidence, outside of the child's statement, exist as to the identity of the abuser, as long as the totality of the evidence provides strong confirmation of the credibility of the child's statements concerning commission of the act and the identity of the abuser" (Matter of Nicole V., supra, p 105).

The court should have decided the CPLR 4401 motion to dismiss at the end of petitioner's case by taking the view of the evidence most favorable to petitioner and from the evidence and the inferences reasonably to be drawn therefrom, determined whether it could find for petitioner by any rational process, resolving questions of credibility in favor of petitioner *(see, Matter of Wayne County Dept. of Social Servs. v Titcomb,* 124 AD2d 989). The trial evidence lacks some of the proof which has been present in other cases where corroboration has been found, i.e., medical proof *(Matter of Joli M.,* 131 Misc 2d 1088; *Matter of Tara H.,* 129 Misc 2d 508, 512-513); respondent's admissions *(Matter of Tantalyn TT.,* 115 AD2d 799, 801; *Matter of Cindy JJ.,* 105 AD2d 189, 191);* in camera interview with the child *(Matter of Dana F.,* 113 AD2d 939, 940-941; *Matter of Tina H.,* 507 NYS2d 653; *Matter of Fawn S.,* 123 AD2d 871, *revg* 128 Misc 2d 186, 188); and validation by an expert *(Matter of Nicole V., supra; Matter of Michael G., supra,* p 192).

However, the evidence in this case establishes that the child at the age of 3½ said he had a secret which would make his mother sad, exhibited behavioral changes, resisted visiting with his father, complained of a sore bottom which was observed to be red, complained of nightmares involving a monster named Paul who poked at his back and belly all night when he was at his father's home, and drew pictures including a pistol which discharged a creamy substance and "houses" which looked like penises. The child's sense of fear and helplessness suggested sexual abuse. The father denied any knowledge of the basis of these behaviors to the mother and to the psychologist. However, the child's reluctance to visit the father abated for a time after the psychologist discussed the matter with the father. An inference reasonably to be drawn from these facts is that the father's behavior may have been modified for a time.

This behavior is consistent with the truth of the statements Ryan made to Corbett. The expert opinion of Schiff concerning the characteristics of a child who has been the victim of intrafamilial child sexual abuse accounts for the child's reluctance to name his father as the perpetrator, even to his mother, and his unwillingness to discuss the subject with Schiff two weeks after he had made a disclosure to Corbett. Expert testimony is admissible to explain the psychological reactions of child victims of sexual abuse *(People v Keindl,* 68

NY2d 410, 422; *People v Benjamin R.*, 103 AD2d 663, 668-670; *People v Grady*, 133 Misc 2d 211, 213-216).

Schiff's expert opinion in response to a hypothetical question that the child had been sexually abused clearly was not the only evidence in the case supporting the reliability of Ryan's statement. Because Family Court concluded that the answer to the hypothetical question had to be disregarded as a matter of law since the hypothetical contained a recitation of some of the contents of the child's out-of-court statement, we deem a further comment on the hypothetical question to be appropriate. In light of Schiff's testimony that disclosure by the child was the most important factor in determining that intrafamilial child sexual abuse had occurred, and in light of her testimony that young children characteristically are extremely reluctant to name a family member as perpetrator, and that once having done so they often refuse to do so on other occasions, the significance of Ryan's story in the hypothetical was that a disclosure had been made at all. The answer to the hypothetical question should have been considered in that context as some evidence that Ryan's account was reliable.

The court in *Nicole V.* (123 AD2d 97, 103, *supra)* observed that: "a substantial body of literature has noted that because of the difficulty young children experience in revealing an act of sexual abuse, especially against a parent, and the usual lack of knowledge very young children have of sexual activity, experts have encountered very few incidents of false allegations. *(See, e.g.,* Sgroi, Handbook of Clinical Intervention in Child Sexual Abuse, at 42, 43, 72 [1982]; McCabe, Cohen and Weiss, Child Sexual Abuse, at 54-57 [1985]; Sloan, Protection of Abused Victims: State Laws and Decisions, at 108-109 [1983]; Burgess, Groth, Holmstrum and Sgroi, Sexual Assault of Children and Adolescents [1978])."

## II

### *The petition is supported by a preponderance of the evidence*

Petitioner urges us to find that the petition has been proved by a preponderance of the credible evidence (Family Ct Act § 1046 [b] [i]). This requires an evaluation of respondent's proof also. Mary M. testified that she lived with Paul from December 1984 until May 1986 and that she continued to date him at the time of trial. She was unaware of any changes in

Ryan's behavior or in his interaction with Paul. Marion M., Paul's mother, testified that Ryan stayed a week at the cottage she and her husband rented during July 1985 and she never noticed redness on his bottom. She noticed no change in the child's behavior in February 1985 or the weekend of February 9, 1986, just prior to the disclosure to Corbett.

### PAUL'S TESTIMONY

Paul testified that he noted no changes in the child's behavior between November 1984 and February 1985. He acknowledged that in February through March 1985 the child refused to visit with him, but he added that the child was having difficulty visiting with anyone. He talked to Ryan about his reluctance and Ryan said he was afraid of the dark and wanted to stay at his house. After Paul returned from a vacation in early March 1985, Ryan's behavior was "great". He acknowledged that Dr. Bennett had mentioned to him in March 1985 that the child might have been abused but he told her that abuse absolutely did not happen in this case. Bennett asked Paul about a monster and a mask and Paul told her he and Ryan occasionally played hide and seek with Halloween masks, starting around Halloween 1984. Paul assured Ryan that there were no monsters and that the mask was pretend. He deferred regular visiting until Dr. Bennett recommended resumption in April 1985.

Paul stated that Ryan was again reluctant to visit on one occasion in August 1985 when he had just awakened from a nap and was cranky. He denied that he ever found Ryan in a strange situation with other adult males in the summer of 1985, as Ryan had stated. He was unaware of any secret Ryan had. The weekend of February 7 through 9, 1986 he observed Ryan to be in great spirits having a wonderful time.

After returning Ryan to Suzanne at about 5:00 P.M. on Sunday, February 9, 1986, Paul and Mary went to a hockey game, returning home shortly after 10:00 P.M. Suzanne was on the telephone speaking hysterically and demanding that he call back in 10 minutes to answer questions he could not understand. After further telephone conversations Sunday evening and Monday, Paul expected to see Suzanne and Ryan on Monday evening. Suzanne changed this to a meeting with Dr. Bennett on Tuesday morning to which Paul agreed. However, the police came to his home Monday evening, and he learned later that Ryan had been taken to Genesee Hospital earlier that evening. The police told him they wished to

discuss his son but Paul refused to go to the police station with them. He did not testify that he asked the police officers for any clarification about his son or what had happened.

Paul's only response to Dr. Bennett's suggestion in 1985 that Ryan might have been sexually abused was to discuss it with Suzanne. He never contacted Dr. Bennett again. Paul understood from his first phone conversation with Suzanne on the evening of February 9, 1986 that she was concerned about Ryan's having been sexually abused. In March 1985, he discussed the possible sexual abuse of Ryan only with Suzanne and Ryan; he did not mention it to Mary. Ryan's denial to Paul that anyone was bothering or hurting him ended the concern in Paul's mind and satisfied him.

On cross-examination Paul said for the first time that Suzanne accused him of sexually abusing Ryan in the first telephone conversation on the evening of February 9, 1986 and threatened to have him arrested. When he refused to accompany the police to the station on the evening of February 10, he said he knew their request concerned Ryan because of Suzanne's threat the night before.

Paul did not attend the meeting with Dr. Bennett scheduled for February 11, although he did not know until later that neither Suzanne nor Ryan had attended either.

The preponderance of credible evidence in this case supports the petition. Petitioner's witnesses were highly credible in describing Ryan's words and behavior. Paul's minimal response to Dr. Bennett's suggestion in March 1985 that Ryan might be sexually abused seems unlikely behavior for a concerned father to whom such a suggestion was a surprise. Paul's failure, until cross-examination, to mention that Suzanne accused him of abuse on February 9, coupled with Suzanne's testimony that she did not know that Ryan accused Paul until after he had talked to Corbett on February 10, cast serious doubt on Paul's credibility.

Accordingly, the order should be reversed, the petition should be granted, and the case remitted to Family Court for a dispositional hearing.

DILLON, P. J., CALLAHAN, DENMAN and LAWTON, JJ., concur.

Order unanimously reversed, on the law, without costs, petition granted and matter remitted to Monroe County Family Court for further proceedings in accordance with opinion by Pine, J.